Gary S. Graifman (GSG 2276)
**KANTROWITZ, GOLDHAMER & GRAIFMAN**
210 Summit Avenue
Montvale, New Jersey 07645
(201) 391-7000

**STULL, STULL & BRODY**
Jules Brody
Howard T. Longman
6 East 45th Street
New York, New York 10017
(212) 687-7230

**WEISS & YOURMAN**
Joseph H. Weiss
551 Fifth Avenue
New York, New York 10176
(212) 682-3025

**Attorneys for Plaintiffs**



RECEIVED-CLERK
U.S. DISTRICT COURT

2002 SEP 19 P 3: 53

FILED

9/19/02

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HARRY AMSTERDAM, PHILIP S. AMSTERDAM, and ANDREW D. AMSTERDAM, on Behalf of themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FLEETBOSTON FINANCIAL CORPORATION, TERRENCE MURRAY, CHARLES K. GIFFORD, ROBERT J. HIGGINS, HENRIQUE C. MEIRELLES, EUGENE M. MCQUADE, ERNEST L. PUSCHAVER, JOEL B. ALVORD, WILLIAM BARNET, III, DANIEL P. BURNHAM, PAUL J. CHOQUETTE, JR., JOHN T. COLLINS, WILLIAM F. CONNELL, GARY L. COUNTRYMAN, ALICE F. EMERSON, JAMES F. HARDYMON, MARIAN L. HEARD, ROBERT M. KAVNER, THOMAS J. MAY, DONALD F. MCHENRY, MICHAEL B. PICOTTE, THOMAS R. PIPER, THOMAS C. QUICK, FRANCENE S. RODGERS, JOHN W. ROWE, THOMAS M. RYAN, PAUL R. TREGURTHA and WILLIAM C. MUTTERPERL,<br><br>Defendants. | **CASE NO.** 02 - 4561 (WGB)<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, Harry Amsterdam, Philip S. Amsterdam, and Andrew D. Amsterdam ("plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except those allegations concerning themselves, which are alleged upon personal knowledge. Plaintiffs' information and belief is based, *inter alia*, on the investigation conducted by plaintiffs' attorneys, including, *inter alia*, a review of the Registration Statement on Form S-4/A filed by defendant FleetBoston Financial Corporation ("FBF" or the "Company") with the Securities and Exchange Commission ("SEC") on January 25, 2001 (the "Registration Statement") issued in connection with the merger completed on or about March 1, 2001 between FBF and Summit Bancorp ("Summit") (the "Merger"); the Proxy Statement and Prospectus included within the Registration Statement (the "Merger Proxy/Prospectus"); FBF's 10-K for the year ending December 31, 1999, FBF's 10-Qs for the three months ending March 31, 2000, June 30, 2000 and September 30, 2000; and other public filings and news articles pertaining to or issued by the Company. Plaintiffs also believe that substantial evidentiary support will exist for the allegations set forth after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.       Plaintiffs bring this action as a class action, on behalf of themselves and all other persons, except defendants, their affiliates, and certain related parties (as defined below), who exchanged shares of Summit common stock for shares of FBF common stock in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus (the "Class"). Plaintiffs herein seek to pursue remedies on behalf of themselves and the Class under the Securities Act of 1933   (the "Securities Act").   Pursuant to the Merger, plaintiffs and other Summit stockholders received 1.02 shares of FBF common stock in exchange for each share of Summit common stock (the "Exchange Ratio").

2.       As is more fully alleged throughout the Complaint, this action arises from damages incurred by the Class as a result of the issuance by defendants of materially false and misleading statements in the Registration Statement and Merger Proxy/Prospectus, which artificially inflated the value of the Company's securities.

-2-

3.     In particular, the Registration Statement and Merger Proxy/Prospectus and/or documents referenced thereby, contained falsely positive and materially misleading information about FBF's success and expertise in Latin American markets, including false financial information regarding FBF's earnings and the amount of its reserves for credit losses. FBF, in fact, concealed material information regarding problems with its loan portfolio in Argentina. As acknowledged by FBF in its 10-K for its year ended 2001, the Republic of Argentina had been impacted by a severe recession that had caused "economic and political instability, as well as significant volatility in its financial markets since 1998." Information regarding the extensive recession in Argentina <u>and its substantial impact on FBF'S loan portfolio</u> was material to Summit shareholders considering how to vote on the Merger, including whether the Exchange Ratio accurately reflected the value of FBF common stock.

4.     As a result of defendants' false statements, misrepresentations, and omissions, the price of FBF securities was artificially inflated at the time of the Merger. FBF shares reached a closing price of $41.00 per share on March 1, 2001, the closing date of the Merger. As a result, the Exchange Ratio utilized in the Merger was artificially deflated and Summit shareholders who exchanged their Summit common stock for FBF common stock in connection with the Merger were harmed by having received insufficient value for their Summit common stock.

5.     On or about December 20, 2001, January 29, 2002, March 2, 2002 and July 15, 2002, defendant FBF announced charges against earnings related to investments in Argentina amounting in total to approximately $2.3 billion. As a result of these announcements, the price of FBF common shares declined to $24.52 on July 15, 2002 and closed on September 10, 2002 at $23.90.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v. The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77(o).

7.    Jurisdiction is conferred upon this Court by § 27 of the Exchange Act, 15 U.S.C §
78aa and 28 U.S.C. § 1331 (federal question jurisdiction). This Court has personal jurisdiction over
the defendants pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.    Venue is proper in this District because many of the acts and transactions constituting the
violations of law herein complained of occurred within this District, including dissemination of the materially
false and misleading Proxy/Prospectus.  Summit Bankcorp, the target of the acquisition and Merger,
maintained its corporate headquarters in Princeton, New Jersey and maintained a substantial portion of its
business in New Jersey. In addition plaintiffs reside in this District.

9.    In connection with the conduct complained of herein, defendants, directly or
indirectly, used the means and instrumentalities of interstate commerce, including the mails and
interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

10.    Prior to the Merger, plaintiffs, who are New Jersey residents, held shares of Summit
common stock that were exchanged for shares of FBF common stock in connection with the Merger
(*see* attached certification) and plaintiffs were damaged thereby.

11.    Defendant FBF is a diversified financial services company organized under the laws
of Rhode Island and registered under the Bank Holding Company Act of 1956.  FBF maintains its
corporate offices at 100 Federal Street, Boston, Massachusetts 02110.  FBF has approximately 20
million customers in more than 20 countries. Its key businesses include small business services,
credit card services, asset management, private banking, consumer banking, retail securities
brokerage, consumer lending, student loan and other processing services, community development
banking, mortgage banking, global markets and foreign exchange, middle market lending,
international banking, debt capital markets, global financial services, commercial finance, industry
banking, investment banking, principal investing and securities specialist services.

12.    Defendant Terrence Murray ("Murray") was, at all relevant times, Chairman and
Chief Executive Officer of FBF.  By virtue of his positions as a director and officer of FBF, and/or
by virtue of his large stock holdings in FBF, Murray was a control person of the Company pursuant

to §15 of the Securities Act.  Because of defendant Murray's positions with FBF, he had access to adverse, non-public information about the Company's investments in Argentina. Defendant Murray signed the Registration Statement.

13.     Defendant Charles K. Gifford ("Gifford") was, at all relevant times, the Company's Chief Operating Officer, President and a Director.  By virtue of his positions as the President, Chief Operating Officer and a Director of FBF, he was a control person of the Company pursuant to § 15 of the Securities Act.  Because of defendant Gifford's positions with FBF, he had access to adverse, non-public information about the Company's investments in Argentina.  Defendant Gifford signed the Registration Statement.

14.     Defendant Robert J. Higgins ("Higgins") was, at all relevant times, the President of Consumer Banking and Investment Services and a Director.  By virtue of his positions as a Director and officer, defendant Higgins was a control person of the Company pursuant to §15 of the Securities Act.  Because of defendant Higgins' position with FBF, he had access to adverse, non-public information about the Company's investments in Argentina.  Defendant Higgins signed the Registration Statement.

15.     Defendant Henrique C. Meirelles ("Meirelles") was, at all relevant times, President of Corporate and Global Banking and a Director of FBF.  By virtue of his positions as a Director and Officer, and his large stock holdings in FBF, defendant Meirelles was a control person of the Company pursuant to §15 of the Securities Act.  Because of defendant Meirelles' position with FBF, he had access to adverse, non-public information about the Company's investments in Argentina. Defendant Meirelles signed the Registration Statement.

16.     Defendant Eugene M. McQuade ("McQuade") was, at all relevant times, Vice Chairman and Chief Financial Officer of FBF.  By virtue of his position as an officer, defendant McQuade was a control person of the Company pursuant to §15 of the Securities Act.  Defendant McQuade signed the Registration Statement.

17.     Defendant Ernest L. Puschaver ("Puschaver") was, at all relevant times, Executive Vice President, Director of Finance and Chief Accounting Officer of FBF.  By virtue of his position

as an officer, defendant Puschaver was a control person of the Company pursuant to §15 of the Securities Act. Defendant Puschaver signed the Registration Statement.

18.    Defendant William C. Mutterperl ("Mutterperl") was, at all relevant times, Executive Vice President, General Counsel and Secretary of FleetBoston. By virtue of his position as an officer, defendant Mutterperl was a control person of the Company pursuant to §15 of the Securities Act. Defendant Mutterperl signed the Registration Statement.

19.    Defendants Joel B. Alvord ("Alvord"), William Barnet, III ("Barnet"), Daniel P. Burnham, Jr. ("Choquette"), John T. Collins ("Collins"), William F. Connell ("Connell"), Gary L. Countryman ("Countryman"), Alice F. Emerson ("Emerson"), James F. Hardymon ("Hardymon"), Marian L. Heard ("Heard"), Robert M. Kavner ("Kavner"), Thomas J. May ("May"), Donald F. McHenry ("McHenry"), Michael B. Picotte ("Picotte"), Thomas R. Piper ("Piper"), Thomas C. Quick ("Quick"), Francene S. Rodgers ("Rodgers"), Thomas M. Ryan ("Ryan"), and Paul R. Tregurtha ("Tregurtha") were at all relevant times directors of FBF. By virtue of the aforementioned persons' positions as directors, they were control persons of the Company pursuant to §15 of the Securities Act and each signed the Registration Statement.

20.    Each defendant is liable to plaintiffs and the Class as a direct participant in the wrongs complained of herein.

21.    The above individual defendants named in paragraphs 12 through 19 (the "Individual Defendants") each signed, and/or consented to being named as a director and/or officer of FBF in the Registration Statement and/or the Merger Proxy/Prospectus, pursuant to which FBF issued securities in connection with the Merger.

22.    The Individual Defendants participated in the drafting, preparation, and/or approval of various false and misleading statements contained in the Registration Statement and Merger Proxy/Prospectus filed by the Company with the Securities and Exchange Commission ("SEC") in connection with the Merger. Because of their Board memberships and/or executive and managerial positions, each of the Individual Defendants was responsible for ensuring the truth and accuracy of

the various statements contained in the Registration Statement and Merger Proxy/Prospectus, including the truth regarding FBF's investments in Argentina.

23. Each of the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's true operational and financial condition and to promptly correct any previously disseminated false or misleading information. As a result of their failure to do so in connection with the preparation and filing of the Registration Statement and Merger Proxy/Prospectus, the price of FBF common stock was artificially inflated prior to, and at the time of, the Merger, causing the Exchange Ratio to be artificially deflated and causing injury to Plaintiffs and the members of the Class.

24. The Individual Defendants, because of their management positions and memberships on the FBF Board, had the power and influence to direct the management and activities of FBF, and its employees, and to cause FBF to engage in the unlawful conduct complained of herein. Accordingly, the Individual Defendants were able to, and did control the contents of the Registration Statement and Merger Proxy/Prospectus. Each Individual Defendant was provided with copies of the filings alleged herein to be false and misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance, and/or to cause them to be corrected, but failed to do so.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

25. Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking to pursue remedies under the Securities Act on behalf of a Class consisting of all persons who exchanged shares of Summit common stock for shares of FBF common stock in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus (the "Class"). Excluded from the Class are defendants, officers and directors of the Company, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

26. The members of the Class are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are thousands of members of the Class. As of January

-7-

31, 2002, FBF had 1,044 million shares of common stock outstanding and actively traded on the New York Stock Exchange in an efficient market, under the ticker symbol "FBF."

27.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members are unknown to the plaintiffs at this time, and can only be ascertained through appropriate discovery, as of the date of record according to the Merger Proxy/Prospectus, there were 26,953 shareholders of record for Summit stock and it is believed that as of January 9, 2001 there were 175,721,433 shares of Summit common stock outstanding and entitled to vote.   Pursuant to the Registration Statement, the Company was authorized to issue, and did issue, approximately 190,093,245 shares of FBF common stock to Summit shareholders in connection with the Merger or reserved for issuance to Summit employees in connection with certain employee benefit plans of Summit in effect at the time of the Merger.  In addition, Summit shareholders surrendered approximately 175,721,433 shares of Summit common stock in connection with the Merger.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are whether:

a.      defendants violated Sections 11, 12(a)(2), and/or 15 of the Securities Act, as alleged herein;

b.      the Registration Statement and Merger Proxy/Prospectus contained materially false and misleading statements of fact;

c.      the Registration Statement and Merger Proxy/Prospectus, and documents incorporated by reference therein, omitted material facts that were necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and

d.      the members of the Class have sustained damages and, if so, the proper measure of those damages.

29.     Plaintiffs' claims are typical of the claims of the members of the Class, as the claims of plaintiffs and the members of the Class are based on the same legal theories, and plaintiffs have

-8-

sustained damages arising out of defendants' wrongful conduct in violation of federal law, as complained of herein.

30.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

31.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for Class members individually to redress the wrongs done to them.    Plaintiffs anticipate no difficulty in the management of this action as a class action.

## NO STATUTORY SAFE HARBOR

32.    The statutory safe harbor provided for forward-looking statements (under certain circumstances) does not apply to any of the false statements and material omissions alleged in this complaint.  The statements alleged to be false and misleading all relate to then-existing facts and conditions.  In addition, none of the statements alleged herein were identified as "forward-looking statements" when made.  Nor did meaningful cautionary language identify important factors that could cause actual results to differ materially from those stated.  To the extent that the statutory safe harbor does apply to any statements alleged herein deemed to be forward-looking, defendants nonetheless are liable for issuing false forward-looking statements because, at the time each of the statements was made, the statements were authorized and/or approved by an executive officer of FBF.

## BACKGROUND

33.    On October 1, 1999 FBF completed its merger with Bank Boston Corporation.  As a result of this merger, the U.S. Justice Department required that FBF divest approximately $13 billion of deposits and $9 billion of loans from the combined companies which at the time FBF expected would result in a loss of net income of approximately $160 million.  The Bank of Boston

had established banking operations in Argentina as early as 1917 and in Brazil since 1947. Defendant Meirelles, a Brazilian national, was president of Bank of Boston which, in 1995, derived 27% of its revenues from international operations.

34.     After its merger with Bank of Boston and the concomitant acquisition of extensive Argentine operations, the Company, in its Summary Annual Report for 1999 (the "1999 Summary Annual Report"), touted its Argentine operations, disclosing the following:

      a.     FBF had 139 branches in Argentina;

      b.     FBF was the #1 fund manager in Argentina;

      c.     FBF's Argentina branch and ATM networks have grown dramatically

from their headquarters, a Buenos Aires landmark since 1924.

35.     In addition, the 1999 Summary Annual Report stated regarding the Company's investments in Argentina that:

> Disciplined focus and several decades of experience in this region led to performance that exceeded our ambitious expectations.   Earnings in the region grew at a significant double-digit rate -- and resulted in record earnings in 1999.

> As a major bank for affluent consumers, we enhanced our 1999 performance following a program of aggressive expansion in 1998, particularly in Argentina and Brazil.  In addition, we are a leading provider of investment services for affluent market segments, and we are among the leading mutual fund managers in Argentina and Brazil.  (EMPHASIS ADDED).

36.     FBF's 2000 Summary Annual Report (the "2000 Summary Annual Report") disclosed the following concerning Latin America:

> Argentina and Brazil contributed another solid year, with double-digit earnings growth over 1999.

> Fleet's global banking is Latin America, where we have been active since 1917. operating there under the "BankBoston" name -- in key Latin America markets, it is among the most recognized of all consumer brands -- we serve many of the region's premier customers. Our competitive strength lies in our extensive experience and outstanding local management. This combination allows us to precisely fit our products and services to the expectations of each consumer and business customer -- as well as to react quickly to profit from changing market conditions. (EMPHASIS ADDED).

37.     Having only recently completed its merger with Bank of Boston and having aggressively touted the success of its Argentine operations, its expertise in this area and its

-10-

aggressive expansion in Argentina in 1998, as set forth above in paragraphs 35 & 36, FBF did not want to report bad news, in particular that its reserve for credit losses regarding its Argentine operations would need to be increased. In particular, FBF had an interest in maintaining the price of its stock because on October 1, 2000, FBF announced that it had signed a definitive merger agreement to acquire Summit, "the leading retail and commercial bank in New Jersey." Defendant Murray announced that Summit was an excellent fit for FBF's "existing franchises making Fleet the number one bank in New Jersey..." Murray further stated that "it furthers Fleet's strategic goals of balanced earnings and leveraging our product and services capabilities over an expanded customer base..."

38.     According to the announcement, Summit shareholders would receive 1.02 shares of Fleet stock, valuing Summit's stock at $39.78 per share (or in the aggregate $7.0 billion.) The transaction was subject to approval by Summit shareholders and was expected to close by March 31, 2001.

39.     Summit was a $39 billion diversified financial services company headquartered in Princeton, New Jersey with 500 branches and was the largest bank holding company in New Jersey based on total assets as of September 30, 2000. The Merger Proxy/Prospectus was issued on or about January 25, 2001.

40.     On March 1, 2001, FBF completed its acquisition of Summit, with 97.2 percent of Summit shareholders approving the Merger.

### THE MISLEADING STATEMENTS IN THE MERGER/PROXY PROSPECTUS

41.     The Merger Proxy/Prospectus incorporated by reference, inter alia, FBF's Form 10-K for the year ended December 31, 1999, which was filed with the SEC on March 9, 2000 ("1999 10K"). For the year ended December 31, 1999, FBF's net income amounted to $2,038 million and the Provision For Credit Losses amounted to $933 million. At December 31, 1999, FBF's total assets were $190,692 million and the Reserve for Credit Losses was $2,488 million, of which $353 million was allocated to International and $114 million was unallocated.

-11-

42.     In the 1999 10K defendants emphasized their high degree of expertise in Argentina.

They also emphasized the economic stability of Argentina in the 1990s — a patently false statement,

in light of the Company's later admission that the economic instability in Argentina had begun in

1998 (as set forth in paragraph 58). The 1999 10K stated, <u>inter alia</u>:

> The International Banking unit includes the Corporation's international
> operations, predominantly in Brazil, where the Corporation has been in business
> since 1947, and Argentina, where the Corporation has done business since 1917.
> In both countries the Corporation is a recognized leader among financial
> institutions. <u>Further leveraging the expertise which it enjoys in these markets,
> the Corporation has been able to develop unique strategies for managing
> businesses in Argentina</u> and Brazil. This business unit also includes operations
> in other Latin American countries, as well as Asia, and offers sophisticated
> foreign exchange products and other services through the capital markets unit.
> This business line excludes operations in Europe, as well as international
> operations related to large corporate and multinational customers, all of which
> are part of the Corporate and Investment Banking business unit.
>
> <u>During the 1990s, Argentina has experienced a period of economic stability
> and low inflation</u>, with the Peso exchange rate tied one-for-one with the U.S.
> dollar. Economic stability and growth has helped foster expansion and
> acquisitions in the Argentine markets, where the Corporation currently operates
> 139 branches, including the operations of Deutsche Bank Argentina, S.A., which
> were acquired in January 1998. The Corporation's total assets in Argentina
> amounted to approximately $10 billion at December 31, 1999, compared to
> approximately $9 billion at December 31, 1998. The Corporation operates diverse
> businesses in this market. Corporate customer product offerings include
> traditional retail lending services, cash management, trade services, foreign
> exchange syndications, corporate finance and various investment banking
> services. Consumers are provided access to mutual fund, insurance, credit card
> and pension management products, in addition to the traditional deposit and
> lending products. (EMPHASIS ADDED).

43.     In the 1999 10K, defendants set forth the Company's policy for determining its

amount for reserve of its credit losses:

> The reserve for credit losses represents the amount available for credit losses
> inherent in the Corporation's loan and lease portfolios. The Corporation
> performs periodic, systematic reviews of its portfolios to identify these
> inherent losses, and to assess the overall probability of collection of these
> portfolios. These reviews result in the identification and quantification of
> loss factors, which are used in determining the amount of the reserve for credit
> losses. In addition, the Corporation periodically evaluates prevailing economic
> and business conditions, industry concentrations, including emerging markets
> risks and cross-border outstandings, changes in the size and characteristics of
> the portfolio and other pertinent factors. Portions of the reserve for credit
> losses are allocated to cover the estimated losses inherent in each loan and
> lease category based on the results of this detailed review process.
>
> Commercial loans and leases are individually reviewed and assigned

-12-



a credit risk rating from "1" (low risk of loss) to "10" (high risk of loss). This process includes the review of loans with a credit risk rating of "8" and above and a principal balance greater than $250,000 to determine the need for a specific loan loss allocation. Additionally, derived or calculated loan loss allocations are provided for credit risk rated loans not specifically allocated. Estimated loss factors are provided for loans with a credit risk rating of "1" to "7" based on their specific credit risk rating classification. The combination of these analyses is the basis for the determination of the commercial loan and lease portions of the reserve for credit losses.

Consumer loans, which include credit cards, residential mortgages, home equity loans/lines, direct/indirect loans, consumer finance and international consumer loans, are generally evaluated as a group based on product type. The determination of the consumer loan portion of the reserve for credit losses is based on one year of forecasted net credit losses. This forecast is determined using several modeling tools, including a delinquency roll rate model, a vintage model and a regression model. Small business loans are analyzed in a similar manner based on delinquency migration. This analysis includes two years of forecasted net credit losses. The results of the analyses are reviewed and discussed by the Corporation's Risk Management Committee, the respective lines of business and the Collections group.

A "sovereign risk" analysis, which assesses the cross-border risk of credit loss, is performed as part of the Corporation's review of its international commercial and consumer loan portfolios.

Testing of forecasted net credit losses and specific allocations of the reserve are performed on a quarterly basis. Adjustments to reserve allocations for specific segments of the loan and lease portfolio may be made as a result of this testing, based on the accuracy of forecasted net credit losses and other credit- or policy-related issues.

The process used by the Corporation to determine the appropriate overall reserve for credit losses is based on this analysis, taking into consideration management's judgment. Reserve methodology is reviewed on a periodic basis and modified as appropriate. Based on this analysis, including the aforementioned assumptions, the Corporation believes that the reserve for credit losses is adequate as of December 31, 1999.

Loans are charged off when they are deemed uncollectible, after giving consideration to factors such as the customer's financial condition, underlying collateral and guarantees, as well as general and industry economic conditions.

44. Additionally, FBF's Note 1 to the Consolidated Financial Statements, which is part

of the 1999 10K, entitled FBF's "Summary Of Significant Accounting Policies" stated:

The reserve for credit losses is available for future charge-offs of existing extensions of credit. Loans and leases, or portions thereof, deemed uncollectible are charged off against the reserve, while recoveries of amounts previously charged off are credited to the reserve. Amounts are charged off after giving consideration to such factors as the customer's financial condition, underlying collateral and guarantees, and general and industry economic conditions.

-13-

The reserve for credit losses reflects management's estimate of losses inherent in the portfolio, considering evaluations of individual credits and concentrations of credit risk, net losses charged to the reserve, changes in the quality of the credit portfolio, levels of nonaccrual loans and leases, current economic conditions, cross-border risks, changes in the size and character of the credit risks and other pertinent factors. The reserve for credit losses related to loans that are identified as impaired, which are primarily commercial and commercial real estate loans on nonaccrual status, is based on discounted cash flows using the loan's effective interest rate, or the fair value of the collateral for collateral-dependent loans, or the observable market price of the impaired loan. Based on these analyses, the reserve for credit losses is maintained at levels considered adequate by management to provide for credit losses inherent in these portfolios. (EMPHASIS ADDED)

45.     FBF's Policy, stated above, complies with Generally Accepted Accounting Principles ("GAAP") which is reflected in Statement of Financial Accounting Standards No. 5 – Accounting for Contingencies ("FAS 5"). FAS 5 requires that an estimated loss from a contingency be accrued by a charge to income if : (a) it is probable that an asset has been impaired; and (b) that the amount of the loss can reasonably be estimated.

46.     The financial results for the year ended December 31, 1999, in particular FBF's net income was materially overstated and its Provision For Credit Losses materially understated because it was probable that FBF's loans in Argentina were impaired and the loss could have been reasonably calculated particularly in light of the expertise that FBF claimed it enjoyed in managing its businesses in the Argentinian markets and the Company's subsequent acknowledgement, as set forth in paragraph 58 below, that economic problems impacting FBF's loans had begun in 1998. In addition, the Company's statement in its 199910K, as set forth in paragraph 42 above, touting that because of the "expertise which it enjoys in these markets, the Corporation has been able to develop unique strategies for managing businesses in Argentina and Brazil" and its statements, as set forth in paragraph 44 above, that its "reserve for credit losses is maintained at levels considered adequate by management", concealed the material problems that FBF was experiencing in Argentina, in particular with its loan portfolio, which were revealed only after the Merger. In particular the Company's positive representations were materially misleading and concealed the fact that its reserves for credit losses were inadequate in light of a then probable risk of non-collectibility.

47.     The Registration Statement and Merger Proxy/Prospectus incorporated by reference FBF's 10-Q for the quarter ended March 31, 2000 (the "M10Q00").

-14-

48.     The M10Q00 disclosed, among other things, that:

....Average international loans and leases increased $1.2 billion to $14.8 billion due to commercial loan growth, primarily in Argentina....

------------------------------

The International Banking unit includes...... Argentina, where the Corporation has a market presence of 139 branches and approximately $10 billion of assets. Compared to the first quarter of 1999, International Banking earnings increased $21 million, or 30%, driven primarily by favorable spreads and increased loan and deposit volumes in key Latin American markets. Average deposit balances grew $1.1 billion during the first quarter, while average loan balances closed the first quarter $1.3 billion ahead of the first quarter of 1999. At March 31, 2000, international mutual fund assets under management totaled $9 billion.

49.     For the quarter ended March 31, 2000, FBF's Net Income amounted to $957 million and the Provision For Credit Losses amounted to $300 million. At March 31, 2000, FBF's Total Assets were $187,814 million and the Reserve for Credit Losses was $2,477 million (M10Q00).

50.     The Merger/Proxy/Prospectus incorporated by reference FBF's 10-Q for the quarter ended June 30, 2000 ("J10Q00"). The J10Q00 disclosed, among other things, that:

...Average international loans and leases increased $1.5 billion to $15.1 billion due to commercial loan growth, primarily in Brazil....[MDA4]

------------------------------

The International Banking unit includes operations in Latin America and Asia, as well as foreign exchange and derivatives businesses. The largest operations are in Brazil, where the Corporation has a franchise with approximately 64 offices and approximately $8 billion of assets, and Argentina, where the Corporation has a market presence of 138 branches and approximately $10 billion of assets. Compared to the second quarter of 1999, International Banking earnings decreased slightly, driven primarily by a $5 million (after-tax) write-down of an investment in the Asia Pacific unit. Excluding this transaction, International Banking earnings increased $4 million, mainly due to favorable spreads and increased loan and deposit volumes in key Latin American markets. Average deposit balances grew $1 billion during the second quarter of 2000, while average loan balances grew $1.9 billion over the second quarter of 1999. At June 30, 2000, international mutual fund assets under management totaled $9 billion. (EMPHASIS ADDED).

51.     For the three and six months ended June 30, 2000, FBF's Net Income amounted to $847 million and $1,804 million, respectively and the Provision For Credit Losses amounted to $310 million and $610 million, respectively. At June 30, 2000, FBF's Total Assets were $181,259 million and the Reserve for Credit Losses was $2,472 million.

52.     The Merger Proxy/Prospectus also incorporated by reference FBF's 10-Q for the quarter ended September 30, 2000 ("S10Q00"). The S10Q00 disclosed, among other things, that:

> During 2000, the Argentine economy has recovered slowly from the recession that it experienced in 1999. Political discussions regarding a plan to improve the economy continue. This situation has led to significant declines in the Argentine debt and equity markets. In response, the government has outlined measures to reduce its costs and effect economic growth. Commitments for additional international financing are also being obtained. To date, the Corporation's Argentine cross-border outstandings and securities portfolio have not been significantly impacted by the economic and political situation described above. The Argentine situation has not significantly impacted other Latin American countries where the Corporation has operations. The Corporation will continue to closely monitor the Argentine economic and political situation and its potential impact on the Corporation's Argentine and other Latin American operations. However, it is not possible to predict what effect, if any, the economic and political events in Argentina will ultimately have on that country's economic growth or on the Corporation's operations in Argentina or in other Latin American countries....

53.     For the three and nine months ended September 30, 2000 FBF's Net Income amounted to $841 million and $2,645 Million, respectively and the Provisions For Credit Losses amounted to $300 million and $911 million, respectively. At September 30, 2000, FBF's Total Assets were $179,093 million and the Reserve for Credit Losses was $2,463 million.

54.     The financial results stated in the M10Q00, J10Q00 and S10Q00, in particular FBF's net income, as set forth in paragraphs 47-52, were materially overstated and the Provision For Credit Losses, as set forth in paragraphs 49, 51 and 53, were materially understated because it was probable that material amounts of FBF's loans in Argentina were impaired and the loss could have been reasonably calculated. FBF failed to increase its provision for credit losses for these periods in accordance with GAAP and FBF's stated policy. This failure is evident, particularly in light of the expertise that FBF claimed it enjoyed in managing its businesses in the Argentinian markets and the Company's subsequent acknowledgement, as set forth in paragraph 58 below, that economic problems impacting FBF's loans had begun in 1998.

## THE TRUTH BEGINS TO EMERGE

55.     On December 20, 2001, as reported in an article in The Boston Globe, defendant FBF, blaming recessions in the United States and in Argentina, slashed fourth quarter after tax earnings by taking a charge against the value of its investments on its books and increased its loan loss

-16-

reserves against loans that might not be repaid of $650 Million. Company spokesman James Maloney stated that the economic crisis in Argentina would cost Fleet $150 million in the fourth quarter because it will have to write down certain Argentine debt it held by $75 million and set aside an additional $75 million for future Argentine loan losses.

56.    On January 15, 2002, FBF announced that it would delay reporting fourth quarter 2001 earnings, citing exposure to Argentina's financial crisis.

57.    On January 29, 2002, defendant FBF announced that it took a charge of $538 million, after taxes, in addition to the $650 million charge announced on December 20, 2001, as set forth in paragraph 55, related to Argentina. FBF CEO and President, Chad Gifford, stated:

> A weakening global economy and the turmoil in Argentina resulted in further pressure on our loan portfolio and we took action in this area by aggressively addressing our problem loans and boosting loan loss reserves.
>
> The corporation is working with the new Argentine government in its efforts to stabilize the economy and we will continue to monitor the situation very closely. FleetBoston has a very experienced management team in Argentina, where we have operated for over 85 years, and have managed through numerous political and economic crisis.

58.    On March 1, 2002, FBF filed its Form 10-K with the SEC for its year ending December 31, 2001 (the "2001 10-K"). In this 10-K defendants acknowledged that they had known of impending problems with the Argentine economy as early as 1998:

> <u>Since 1998 Argentina has been impacted by a severe recession that has caused continued economic and political instability, as well as significant volatility in its financial markets.</u> This situation culminated in December 2001 with the resignation of the president and ongoing series of new economic measures and governments. The Argentine government continues to announce new measures to manage the country's financial situation. (EMPHASIS ADDED).

59.    The positive statements made by defendants in its Merger Proxy/Prospectus regarding the Argentine economy, in particular that "During the 1990s, Argentina has experienced a period of economic stability and low inflation" as set forth in paragraph 42, and results in the 199010K, M10Q00, J10Q00, and S10Q00, as set forth in paragraphs 41 and 49, 51, and 52, were materially false and misleading when they were made, since FBF itself acknowledged that the severe recession in Argentina that eventually resulted in approximately $2.3 billion in charges had begun as early as 1998, as set forth above in paragraph 58, long before the issuance of the Merger Proxy/Prospectus.

-17-

In contrast, the 1999 or 2000 Summary Annual Reports contained primarily glowingly positive statements, as set forth in paragraphs 38 and 39, above, regarding the Company's investments and operations in Argentina.

60. As reported by Bloomberg on March 2, 2002, FBF disclosed in an SEC filing that it had lost $521 million doing business in Argentina last year, in contrast to earning $120 million there in 2000 and that FBF had set aside $750 million pretax to cover unpaid loans in Argentina. FBF finally stated that it would not predict how future political and economic instability would influence operations in Argentina. In contrast, in the Merger Proxy/Prospectus, FBF had not said it would not make such predictions and, in fact, had made primarily positive statements about itself concerning Argentina.

61. On July 15, 2002, FBF announced that it would take a charge of $675 million related to the deteriorating Argentine economy, in addition to $251 million in "translation losses" due to the falling peso, bringing total charges relating to the Argentine situation for the second quarter to $925 million. As a result of these actions, FBF has now taken cumulative charges of approximately $2.3 billion since the beginning of the Argentine crisis. In addition, during the second quarter the Company placed all sovereign-related assets and a significant portion of private sector loans on nonaccrual status. At June 30, 2002, total nonperforming assets in Argentina amounted to $2.0 billion, which represented over 50% of all of FBF's non-performing assets. At June 30, 2002, FBF's reserve for credit/losses amounted to $3,867 million, of which approximately one-third related to Argentina.

### COUNT I

**Against FBF For**
**Violations of Section 11 of the Securities Act**

62. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs, as if fully set forth herein. This Count is asserted against defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all Summit shareholders who exchanged their Summit common stock for FBF stock issued in connection with the Merger, and pursuant to the Registration Statement.

-18-

63.     The Registration Statement and those documents and disclosures incorporated by reference therein, were materially false and misleading; contained untrue statements of material facts, omitted to state material facts necessary to make the statements made in the Registration Statement, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Registration Statement included, but were not limited to, the overstatement of earnings for 1999 and the first nine months of 2000 resulting from the understatement of FBF's Provision for Credit Losses. These misrepresentations also included the representations contained in documents incorporated by reference in the Registration Statement, which touted FBF's expertise in Argentina while failing to provide information or warning regarding the Argentinian recession and its probable impact on FBF's loan portfolios. In fact, as set forth in paragraph 58, after the end of the Class Period, FBF acknowledged that they had been experiencing problems in Argentina as early as 1998. These problems were the very market conditions which would likely result in substantial and material charge-offs by FBF, including but not limited to charge-offs for bad loans, relating to the deteriorating Argentine economy. This information was material to Summit shareholders considering how to vote on the Merger, including whether the Exchange Ratio accurately reflected the value of FBF common stock.

64.     FBF was the registrant for the shares issued pursuant to the Merger, and filed the Registration Statement as the issuer of its common stock, as defined in Section 11(a)(5) of the Securities Act.

65.     FBF was the issuer of the common stock issued pursuant to the Registration Statement. As issuer of such common stock, FBF is liable to plaintiffs and the members of the Class who exchanged Summit common stock for FBF common stock in connection with the Merger and pursuant to the Registration Statement.

66.     Plaintiffs and members of the Class each acquired FBF common stock issued pursuant to the Registration Statement.

-19-

67.     At the time they acquired FBF's common stock pursuant to the Registration Statement, neither plaintiffs nor any member of the Class knew, or by the exercise of reasonable care could have known, of the material misstatements and/or omissions alleged herein.

68.     This action was brought within two years after the discovery of the untrue statements and/or omissions and within five years after the FBF common stock was acquired in connection with the Merger.

69.     By reason of the foregoing, defendants violated Section 11 of the Securities Act and are liable to plaintiffs and the members of the Class, each of whom has been damaged by reason of such violation. Defendant FBF is liable for its violations of Section 11 of the Securities Act under applicable principles of corporate law.

## COUNT II

### Against the Individual Defendants
### For Violations Of Section 11 Of The Securities Act

70.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing and subsequent paragraphs, as if fully set forth herein. This Count is asserted against the Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Summit shareholders who exchanged their Summit common stock for FBF common stock issued in connection with the Merger and pursuant to the Registration Statement.

71.     The Registration Statement and those documents and disclosures incorporated therein by reference, were materially false and misleading; contained untrue statements of material facts, omitted to state material facts necessary to make the statements made in the Registration Statement, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Registration Statement included, but were not limited to, the overstatement of earnings for 1999 and the first nine months of 2000 resulting from the understatement of FBF's Provision for Credit Losses, as well as the representations contained in documents incorporated by reference in the Registration Statement, which touted FBF's expertise in Argentina while failing to provide information or warning regarding then the Argentinian recession and its probable impact on

FBF's loan portfolios. In fact, as set forth in paragraph 58, FBF acknowledged that they had been experiencing problems in Argentina as early as 1998. These problems were the very market conditions which would likely result in substantial and material charge-offs by FBF, including but not limited to charge-offs for bad loans, relating to the deteriorating Argentine economy. This information was material to Summit shareholders considering how to vote on the Merger, including whether the Exchange Ratio accurately reflected the value of FBF common stock.

72.     The Individual Defendants were responsible for the contents of the Registration Statement and caused its filing with the SEC.

73.     The Individual Defendants signed the Registration Statement, consented to being named therein as directors and/or officers of FBF, and caused it to be prepared and filed with the SEC and circulated to shareholders of Summit.

74.     None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements, contained in the Registration Statement, and described herein, were true, were without omission of any material facts, and/or were not misleading.

75.     Plaintiffs and other members of the Class each acquired FBF common stock issued pursuant to the Registration Statement and Merger Proxy/Prospectus.

76.     At the time they acquired FBF's common stock pursuant to the Registration Statement, neither Plaintiffs nor any member of the Class who exchanged their Summit common stock for FBF common stock knew, or by the exercise of reasonable care could have known, of the facts concerning the material misstatements and/or omissions alleged herein.

77.     This action was brought within two years after the discovery of the untrue statements and/or omissions, and within five years after the FBF common stock was acquired in connection with the Merger.

78.     By reason of the foregoing, the Individual Defendants violated Section 11 of the Securities Act and are liable to plaintiffs and the members of the Class, each of whom has been damaged by reason of such violation.

## COUNT III

### Against FBF For Violations Of
### Section 12(a)(2) Of The Securities Act

79.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing and subsequent paragraphs, as if fully set forth herein. This Count is asserted against FBF for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2) on behalf of all Summit shareholders who exchanged their Summit common stock for FBF common stock issued in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus.

80.     As set forth in the Registration Statement and Merger Proxy/Prospectus Statement, Summit shareholders received 1.02 shares of FBF common stock for each share of Summit common stock they sold pursuant to the Merger. FBF, acting through employees and others, including, but not limited to, the Individual Defendants, solicited such exchanges through the preparation and dissemination of the Registration Statement and Merger Proxy/Prospectus.

81.     The Registration Statement and Merger Proxy/Prospectus Statement contained untrue statements of material facts, and concealed and failed to disclose material facts, as detailed above. FBF and its employees and agents owed plaintiffs and the other members of the Class the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Merger Proxy/Prospectus to ensure that such statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. FBF, in the exercise of reasonable care by its employees and agents, should have known of the misstatements and omissions contained in the Registration Statement and Merger Proxy/Prospectus, as set forth above.

82.     At the time they exchanged their Summit common stock for FBF common stock issued pursuant to the Registration Statement and Merger Proxy/Prospectus, plaintiffs and the other members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the material misstatements and/or omissions alleged herein.

83.     By reason of the conduct alleged herein, FBF violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, plaintiffs and other members of

the Class sustained substantial damages in connection with their exchange of Summit common stock for shares of FBF common stock. Accordingly, plaintiffs and the other members of the Class who acquired FBF common stock issued pursuant to the Registration Statement and Merger Proxy/Prospectus were harmed, and seek damages and/or rescission to the extent permitted by law. Defendant FBF is liable for its violations of Section 12(a)(2) of the Securities Act under applicable principles of corporate law.

**COUNT IV**

**Against The Individual Defendants For**
**Violations Of Section 15 Of The Securities Act**

84.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing and subsequent paragraphs, as if fully set forth herein. This Count is brought against the Individual Defendants pursuant to Section 15 of the Securities Act on behalf of all Summit shareholders who acquired FBF common stock in connection with the Merger.

85.     Each of the Individual Defendants was a controlling person of the Company within the meaning of Section 15 of the Securities Act at the time of the Merger. At the time Summit was merged with and into FBF, and when the Registration Statement and Merger Proxy/Prospectus were filed with the SEC, each of the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, including the issuance of the false and misleading Registration Statement and Merger Proxy/Prospectus.

86.     None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Merger Proxy/Prospectus were true and devoid of any omissions of material facts. Therefore, by reason of their positions of control over FBF, as alleged herein, each of the Individual Defendants is jointly and severally liable with, and to the same extent as, FBF to plaintiffs and other members of the Class as a result of the wrongful conduct alleged herein.

**WHEREFORE,** plaintiffs and the Class pray for judgment as follows:

1.     Determining that this action is a proper Class action under Rule 23 of the Federal
       Rules of Civil Procedure;

- 2 3 -

2.    Awarding damages, including compensatory damages, and such other damages allowed for violations of Sections 12(a) and 15 of the Securities Act in favor of plaintiffs and members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing pursuant the Securities Act, in an amount to be proven at trial, including interest thereon;

3.    Awarding damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing as measured pursuant Section 11(e) of the Securities Act, including recissory damages, in an amount to be proven at trial, including interest thereon;

4.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

5.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: September____**9**____, 2002

Respectfully submitted,

By:_____
Gary S. Graifman (GSG 2276)
**KANTROWITZ, GOLDHAMER & GRAIFMAN**
210 Summit Avenue
Montvale, New Jersey 07645
(201) 391-7000

**STULL, STULL & BRODY**
Jules Brody
Howard T. Longman
6 East 45th Street
New York, New York 10017
(212) 687-7230

**WEISS & YOURMAN**
Joseph H. Weiss
551 Fifth Avenue
New York, New York 10176
(212) 682-3025

**Attorneys for Plaintiffs**
- 24 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Philip S. Amsterdam, hereby certifies and says:

1. On this date, I reviewed a complaint in an action entitled Amsterdam v. FleetBoston Financial Corporation, et al., to be filed in the United States District Court for the District of New Jersey. I authorize counsel to file this complaint on my behalf and add my name to any amended complaint.

2. I did not acquire shares of FleetBoston Financial Corporation ("FBF"), the security that is the subject of this action, at the direction of counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. The following includes all of my transactions in FBF common shares during the class period specified in the complaint: I acquired 8200 shares of FBF pursuant to the merger between FBF and Summit Bancorp ("Summit") in exchange for 8,364 shares of Summit.

5. I have not sought to serve as a class representative under the provisions of the federal securities case in any case during the last three years.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

7. The matters stated in this Certification are true to the best of my current knowledge, information and belief.

8.    I hereby declare, under penalty of perjury, that the foregoing is true and correct.

Philip S. Amsterdam

Dated: September 12, 2002

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Andrew David Amsterdam hereby certifies and says:

1.      On this date, I reviewed a complaint in an action entitled <u>Amsterdam v. FleetBoston Financial Corporation, et al</u>, to be filed in the United States District Court for the District of New Jersey. I authorize counsel to file this complaint on my behalf and add my name to any amended complaint.

2.      I did not acquire shares of FleetBoston Financial Corporation ("FBF"), the security that is the subject of this action, at the direction of counsel or in order to participate in this private action.

3.      As Power of Attorney for Harry Amsterdam, I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      The following includes all of my transactions in FBF common shares during the class period specified in the complaint: I acquired _102_ shares of FBF pursuant to the merger between FBF and Summit Bancorp ("Summit") in exchange for _102_ shares of Summit.

5.      I have not sought to serve as a class representative under the provisions of the federal securities case in any case during the last three years.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

7.      The matters stated in this Certification are true to the best of my current knowledge, information and belief.

8.      I hereby declare, under penalty of perjury, that the foregoing is true and correct.

_____
Andrew David Amsterdam

Dated: September 12, 2002

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Andrew Amsterdam, under Power of Attorney attached hereby certify for Harry Amsterdam the following:

1.  On this date, I reviewed a complaint in an action entitled Amsterdam v. FleetBoston Financial Corporation, et al, to be filed in the United States District Court for the District of New Jersey. I authorize counsel to file this complaint on his behalf and add his name to any amended complaint.

2.  I did not acquire shares of FleetBoston Financial Corporation ("FBF"), the security that is the subject of this action, at the direction of counsel or in order to participate in this private action.

3.  As Power of Attorney for Harry Amsterdam, I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  The following includes all of my transactions in FBF common shares during the class period specified in the complaint: I acquired 16,048 shares of FBF pursuant to the merger between FBF and Summit Bancorp ("Summit") in exchange for 16,369 shares of Summit.

5.  I have not sought to serve as a class representative under the provisions of the federal securities case in any case during the last three years.

6.  I will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

7.  The matters stated in this Certification are true to the best of my current knowledge, information and belief.

8.  I hereby declare, under penalty of perjury, that the foregoing is true and correct.


Andrew Amsterdam
Under Power of Attorney for Harry Amsterdam

Dated: September 12, 2002