<u>**RE-ISSUED FOR PUBLICATION IN FEDERAL SUPPLEMENT**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                                     :
In Re FLEETBOSTON                    :        Civil Action No. 02-4561 (GEB)
FINANCIAL CORPORATION          :
SECURITIES LITIGATION              :        **O P I N I O N**
                                                     :

**APPEARANCES:**

GARY S. GRAIFMAN, Esq.,
        KANTROWITZ GOLDHAMER & GRAIFMAN, ESQS.
        210 Summit Avenue
        Montvale, New Jersey 07645
        and
JULES BRODY and HOWARD T. LONGMAN, Esqs.,
        STULL, STULL & BRODY
        6 East 45th Street
        New York, New York 10017
        and
JOSEPH H. WEISS, RICHARD A. ACOCELLI and JULIA J. SUN, Esqs.,
        WEISS & LURIE
        551 Fifth Avenue
        New York, New York 10176
        and
SAMUEL H. RUDMAN, ROBERT M. ROTHMAN and EVAN KAUFMAN, Esqs.,
        LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS LLP
        58 South Service Road, Suite 200
        Melville, New York 11747
        and
JOSEPH J. DEPALMA, Esq.,
        LITE, DEPALMA, GREENBERG & RIVAS, LLC
        Two Gateway Center, 12th Floor
        Newark, New Jersey 07102
        and
ROBERT J. BERG, Esq.,
        BERNSTEIN, LIEBHARD & LIFSHITZ, LLP
        2050 Center Avenue, Suite 200
        Fort Lee, New Jersey 07024
Attorneys for Plaintiffs HARRY AMSTERDAM, PHILIP S. AMSTERDAM, ANDREW D.
AMSTERDAM, ARTHUR J. BAUERNFEIND, JENNIFER CHANA FINK, DR. STEPHEN PAUL
and the class of all others similarly situated.

JEFFREY A. ROSENTHAL, MITCHEL A. LOWENTHAL, JOSEPH LANDAU, JAMES C. CLARK and ZOE SEGAL-REICHLIN Esqs.,
>CLEARY, GOTTLIEB, STEEN & HAMILTON LLP
>One Liberty Plaza
>New York, New York 10006
>and
SCOTT T. TROSS, Esq.,
>HERRICK, FEINSTEIN, LLP
>One Gateway Center, 22nd Floor
>Newark, New Jersey 07102,

Attorneys for Defendants FLEETBOSTON FINANCIAL CORPORATION, TERRENCE MURRAY, CHARLES K. GIFFORD, ROBERT J. HIGGINS, HENRIQUE C. MIEIRELLES, EUGENE M. MCQUADE, ERNEST L. PUSCHAVER, JOEL B. ALVORD, WILLIAM BARNET III, DANIEL P. BURNHAM, PAUL J. CHOQUETTE, JR., WILLIAM F. CONNELL, GARY L. COUNTRYMAN, ALICE F. EMERSON, JAMES F. HARDYMON, MARIAN L. HEARD, ROBERT M. KAVNER, THOMAS J. MAY, DONALD F. MCHENRY, MICHAEL B. PICOTTE, THOMAS R. PIPER, THOMAS C. QUICK, FRANCENE S. RODGERS, JOHN W. ROWE, THOMAS M. RYAN, PAUL R. TREGURTHA, WILLIAM C. MUTTERPERL and JOHN T. COLLINS.

## TABLE OF CONTENTS

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.      Pre-Certification History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.      Certification of the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.      Post-Certification History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      D.      Events That Gave Rise to the Instant Motions . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.     Motion Contesting Re-Appointment of Class Representative . . . . . . . . . . . . . . . . . . . 16

      A.      Considerations the Parties Left Unaddressed . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      B.      Considerations Addressed by the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      C.      Candidacy Meeting Class Representative Requirements . . . . . . . . . . . . . . . . . 27

V.      Motion Requesting Class Decertification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

      A.      The Court's Power of Review and Applicable Test . . . . . . . . . . . . . . . . . . . . . . 44

      B.      Decertification Is Unwarranted at the Instant Juncture . . . . . . . . . . . . . . . . . . 50

VI.     Rule 56 Motion and the Future Course of this Litigation . . . . . . . . . . . . . . . . . . . . . . 72

VII.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

**BROWN, Chief Judge:**

I.   **INTRODUCTION**

This matter comes before the Court upon: (a) the class' counsel's motion for substitution of class representative, see Docket Entry No. 113; (b) Defendants' motion for decertification of Plaintiffs' class, see Docket Entry No. 119; and (c) the parties' (apparently joint) motion to postpone their motion(s) for summary judgment until after the Court's final determination as to certification of the class is made. For the reasons set forth below, these motions will be DENIED.

II.   **FACTUAL BACKGROUND**

The underlying factual events began to unfold on October 1, 1999, when Fleet Financial Group merged with BankBoston Corporation ("BankBoston"), a then-holder of 139 Argentine bank branches and the top fund manager in Argentina.  See Docket Entry No. 28, at 2-3.  The merger produced FleetBoston Financial Corporation ("FBF").  See id. at 3.  As the merger and acquisition trend in the U.S. banking industry continued, FBF merged with Summit Bancorp ("Summit") in October 2000 ("FBF-Summit Merger").  See id.  Under the terms of the FBF-Summit Merger agreement, Summit shareholders received 1.02 shares of FBF for each share of Summit they owned in a fixed-stock exchange.  See id.

> In connection with that [second] merger, FBF and Summit jointly filed a Merger Proxy/Prospectus with the Securities and Exchange Commission ("SEC"), and FBF filed a Merger Registration Statement and Prospectus ("Merger Registration Statement") on January 25, 2001, which was later amended and supplemented on March 1, 2001, the actual closing date of the merger.  FBF's Merger Registration Statement incorporated by reference a number of FBF's SEC filings [executed] prior to the date of the merger, such as its 1999 Form 10-K and its Form 10-Q reports for the first, second, and third quarters of 2000.

Id. at 3-4.  The mergers took place during the financial crises that spread through emergent

markets of the late 20th Century and reached Argentina by the third quarter of 1998.  The

Argentine government sought to protect the domestic economy by devaluating the national

currency, the Peso, which had been pegged to the United States Dollar since 1992 in order to

establish a stable exchange rate, control the inflation rate and ensure Argentine economic growth.

See id. at 4.  By the time of  the FBF-Summit Merger, it was clear that Argentina was in

deepening recession, FBF's Argentine assets were publically qualified as investments offering

poor financial security, and the financial situation continued to worsen after the FBF-Summit

Merger.   See id. at 5-6.

Fourteen months after the FBF-Summit Merger, Argentina underwent a period of

economic and social turbulence, during which the Argentine Peso was un-pegged from the U.S.

dollar and devaluated dramatically, causing substantial losses to all holders of Argentine

investments, including FBF.  See id. at 6-7.  Although FBF had loan loss reserves, these reserves

proved to be insufficient to offset the total loss suffered by FBF as a result of Argentine recession

and devaluation of the Peso.[1]  Eventually, the language used in the Merger Registration

Statement (read in light of the insufficiency of FBF's loan loss reserves) gave rise to the instant

litigation on behalf of former Summit shareholders who received shares of FBF in exchange for

his/their Summit shares.[2]

---

[1]

"[A] loan loss reserve . . . is [an] account set up by a bank based on its expectations about
future loan losses.  As losses occur, they are charged against this reserve.  That is, the loan account
is credited and the reserve account is debited."  Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 (3d
Cir.), cert. denied, 506 U.S. 934 (1992).

[2]  "Plaintiffs' . . . Complaint [was] founded on the premise that . . . Defendants were
required to increase the amount of its loan loss reserves for its Argentine loans and investment,
yet failed to do so [and the] inadequacy of FBF's loan loss reserves [rendered] the Merger

III.   **PROCEDURAL HISTORY**

While the factual backdrop of this action, colored by international monetary policies, is already somewhat complex, the procedural background of this matter appears to be even more complicated.  This Court, therefore, finds it useful to outline the pertinent procedural history of this matter in significant detail.

A.   **PRE-CERTIFICATION HISTORY**

The class' counsel filed their original complaint in this matter ("Initial Complaint") on September 19, 2002, see Docket Entry No. 1, and the matter was assigned to United States District Judge William G. Bassler ("Judge Bassler").  The Initial Complaint named, as Plaintiffs in this action, the Amsterdam family ("the Amsterdams") consisting of: (1) Harry Amsterdam ("Amsterdam-Sr."); (2) Philip S. Amsterdam ("Amsterdam-Jr."); (3) Andrew D. Amsterdam ("Amsterdam-Grandson") and, in addition, an unspecified number of unnamed entities collectively designated as "All Others Situated Similarly [to the Amsterdams]." Id. at 1 (caption).   On November 19, 2002, two months after filing their action, the Amsterdams moved to consolidate this matter with two other matters, Civil Action No. 02-4724 (brought by plaintiff Stephen Paul ("Paul")) and Civil Action 02-5427 (brought by plaintiff Jennifer Chana Fink ("Fink")).  See Docket Entry No. 3, at 2.  In support of their motion to consolidate, the Amsterdams filed a declaration executed by a Benjamin Benson (presumably, an attorney employed by a law firm, which firm referred to itself as a "liaison counsel" for the Amsterdams ("Benson")); the declaration notified Judge Bassler that Benson was "filing a motion for appointment of . . . the following proposed lead plaintiffs: . . . Amsterdam[-Sr.,] Amsterdam[-

Registration Statement materially false and misleading."  Docket Entry No. 28, at 14.

Jr.], Arthur L. Foster and Walter H. Foster, Jr. [('the Fosters')], Arnold D. Mohel [('Mohel')],

John J. Kulik and Judith T. Kulik [('the Kuliks')]."  Docket Entry No. 4, at 1.  In other words,

two months after the initiation of this action, the candidacies of Amsterdam-Grandson, Paul and

Fink vanished from the list of potential lead plaintiffs, and putative class members Mohel, the

Fosters and the Kuliks took their places.

On January 9, 2003, Judge Bassler issued an order and accompanying opinion granting

the motion to consolidate cases, as well as the motion to appoint Amsterdam-Sr., Amsterdam-Jr.,

Mohel, the Fosters and the Kuliks as lead plaintiffs of the putative class.  See Docket Entries

Nos. 6, 7.

## B.      CERTIFICATION OF THE CLASS

A year and a half passed by.  Following the class' counsel's filing of an amended

complaint ("Amended Complaint"), Defendants' motion to dismiss that complaint,  Judge

Bassler's partial grant and partial denial of the aforesaid motion, Defendants' filing of their

answer, as well as issuances of numerous scheduling orders and entries of multiple stipulations,

the class' counsel finally filed their motion for class certification.  See Docket Entry No. 40.  The

motion was filed on September 28, 2004, and sought, inter alia, appointment, as lead plaintiffs,

of two parties: (1) "The Estate of . . . Amsterdam[-Sr.], by . . . Amsterdam[-Jr.] as Executor"; and

(2) "Allen Nimensky [('Nimensky')] as trustee for Nimensky & Gallinson,  a Professional

Association Target Benefit Plan."  Docket Entry No. 40-1, at 1-2.  That language indicated that,

sometime between November 19, 2002, and September 28, 2004: (1) Amsterdam-Sr. passed

away, apparently testate, and his estate was in the process of liquidation by Amsterdam-Jr., in his

capacity as the executor approved by Amsterdam-Sr.'s probate court; but (2) Amsterdam-Jr.,

Mohel, both Fosters and both Kuliks vanished, meanwhile, from the list of putative lead

plaintiffs (just as Paul, Fink and Amsterdam-Grandson did before them), and their positions were

taken over solely by one person, Nimensky.  See id.

Yet, twenty days later, that is, on October 18, 2004, the class' counsel filed their amended

motion for certification of the putative class.  See Docket Entry No. 43.  The amended motion

indicated that Nimensky followed the path already taken by Paul, Fink, Amsterdam-Jr.,

Amsterdam-Grandson, Mohel, both Fosters and both Kuliks, i.e., his candidacy also vanished

from the list of potential class representatives leaving the then-liquidating Estate of Amsterdam-

Sr. as the sole named plaintiff who was represented by a team of six attorneys from four law

firms, one in New Jersey and three in New York.[3]  See id. at 27 (the signature page).[4]

Recognizing that testamentary estates (i.e., juridical entities of temporary existence) neither

administer nor liquidate themselves but, rather, act through their probate-court-approved

executors or administrators, the class' counsel, in their amended motion, duly addressed the

qualifications of Amsterdam-Jr. as a lead plaintiff (in his capacity as the executor of

Amsterdam-Sr.'s Estate).  See id. at 22-23.  Specifically, the class' counsel pointed out that

Amsterdam-Jr. suffered of "no disabling conflicts of interest between [himself and the putative

class, because the Estate he was liquidating] has been damaged as a result of [D]efendants' false

---

[3]  Defendants' memorandum clarifies that (unlike Amsterdam-Sr. himself or Amsterdam-Jr., or Amsterdam-Grandson, who all held to their stock in Defendants' business during the class period) the Estate of Amsterdam-Sr. qualified as a member of the class when the Estate sold, apparently for estate tax purposes, its stock in Defendants' business during the class period.  See Docket Entry No. 119, at 5.

[4]  Since the class' counsel's pagination of Docket Entry No. 43-2 is such that pages do not correspond to the Table of Contents, the Court refers to pagination created as a result of the document's electronic docketing and available to the reader through the PACER feature.

and misleading statements contained in the Merger Registration Statement."  Id. at 22.

In addition to addressing the issue of adequacy of the proposed class representative, the class' counsel's amended motion for certification asserted, inter alia, that the putative class was "so numerous that joinder of all members [was] impracticable."  Docket Entry No. 43-2, at 17-18 (citing case law evaluating the threshold number of class members  in the range from 40 to 90 entities).  The class' counsel based their conclusion on the following reasoning:

> Although plaintiffs have not at this time ascertained the precise number of potential class members, as of the date of record according to the Merger Registration Statement, there were 26,953 shareholders of record of Summit stock, and it is believed that as of January 9, 2001 there were 175,721,433 shares of Summit common stock outstanding and entitled to vote on the Merger. Ultimately FBF issued more than 190 million shares of stock in exchange for all of the outstanding stock of Summit. Thus plaintiffs believe that the proposed class consists of thousands of Summit shareholders who exchanged millions of Summit shares of common stock. . . . Clearly, the proposed class consists of a sufficient number of persons to make joinder impracticable.

Id. at 18 (citations omitted).

Following Defendants' filing of their opposition to the class' counsel's amended motion for certification (in which Defendants asserted that neither the fact of  26,953 shareholders of record of Summit stock nor the fact of 175,721,433 outstanding shares of common stock on a certain day, established the amount of eligible class members, see Docket Entry No.  51, at 11-12), the class' counsel submitted their reply, together with a declaration by  R. Allan Miller ("Miller Decl.").[5]  See Docket Entries No. 56 and 56-3.  In pertinent part, the Miller Declaration

---

[5]  Miller's resume was attached to the Miller Declaration; it was accompanied by a summary of services provided by Miller's business.  See Docket Entry No. 56-3, at 7-11.  The resume and business summary indicated that his business concentrated on investment consulting and made a substantial part of its profit from Miller's employ as an expert witness, presumably in the areas of investment and/or finance.  See id.. at 9-11. Miller's resume stated that his education consisted of a B.S. in Economics and an MBA in Financial Accounting.  See id. at 7.

stated as follows:

> At the time of the merger, there were approximately 177 million shares of Summit Bank outstanding which were exchanged into approximately 180.5 million shares of Fleet stock. According to the merger proxy, there were over 23,000 shareholders of record of Summit bank stock at about that time. This is an extremely large number of shareholders of record of that date. That is, there are many, many stocks which do not have anywhere near that number of shareholders of record, due to common practice of shares being held in brokerage firm, depository or nominee name. Lists of institutional shareholders available on Thomson Financial Shareworld show that there were 282 institutional holders of Summit Bank stock as of the last date for which data was available prior to the merger[,] which was after the announcement of the merger. This is meaningful because if an institutional shareholder did not want to own the stock after the merger, it could have sold before that date. With the numerosity threshold at 40 or even 90, suggesting that there were not sufficient [amount of] shareholders is simply ludicrous.

Docket Entry No. 56-3, at 4.[6]

---

[6] Miller declared that:

> Plaintiffs have pled claims under both Section 11 and Section 12. Under Section 12, the measure of damages is rescission; any shareholder who lost money after the merger date would be a damaged Section 12 shareholder. Obviously there are many thousands of such shareholders as the stock price began to decline immediately and did not recover to the merger level until December of 2003, over two and one-half years later. . . . The Defendants have attempted to bring the determination of damage function, which is at least partially based on factual information, forward to this stage of the litigation and make it part of the class certification analysis. While it does not seem to be proper, [Miller, nonetheless,] examine[s] the[se] issues . . . . Defendants state that there are no damages under a Section 11 measure prior to [beginning of the class period. Miller does] not know that it is true and in fact ha[s] some doubt about that . . . . However, [even] under Defendants' construct, the Section 11 holders who sold [their shares during the class period] are those who are damaged.

Id. at 5. This Court does not understand why the class' counsel relied upon the assistance of an "expert" to set forth both the legal regime of Section 11 and Section 12, and the scope of *legal* analysis associated with the process of class certification. The Court also questions the class' counsel's offering of the *legal opinion* of someone offered as a *finance expert* (and whose resume indicates no legal education or experience) *to Judge Bassler* and--as part of the class' counsel's current motion--*to this Court*: it is axiomatic that no expert may provide a legal opinion. See,

On December 22, 2005, Judge Bassler granted the amended motion for certification and issued an order appointing Amsterdam-Jr., as executor of Amsterdam-Sr.'s Estate, to act as the class representative.  See Docket Entry No. 76.  In addition, Judge Bassler found Amsterdam-Jr.'s candidacy (as executor of the then-liquidating Amsterdam-Sr.'s Estate) sufficient to meet the Rule 23 requirements as to appointment of class representative.  See id. at 8-9 (noting that the candidacy satisfied the requirements because: (1) Amsterdam-Jr. had "considerable knowledge of the circumstances that gave rise to this action"; (2) "spent substantial amount of time reviewing the issues and becoming aware of the claims against [Defendants]; and (3) "the facts [presented for Judge Bassler's review by the class' counsel and Defendants did not indicate that] there [were] foreseeable conflicts in the interests of the [e]state of [Amsterdam-Sr.] and the class members").

## C.    POST-CERTIFICATION HISTORY

During the next two and a half years, various motions, including Defendants' motion to dismiss the Amended Complaint, were resolved; numerous scheduling orders were entered; the parties began and completed extensive factual discovery, in this country and abroad; and Defendants geared up to file their motion for summary judgment.  See, e.g., Docket Entry No. 81, at 16 (where the class' counsel notified the Court that they were aware of Defendants' plans to make a summary judgment motion in the near future).  Meanwhile, after Judge Bassler's retirement from the bench, the case was ultimately reassigned to the undersigned on July 27,

---

e.g., United States v. Leo, 941 F.2d 181, 196-97 (3d Cir. 1991).  Finally, it appears that the class' counsel omitted to notice that Miller's two "expert" legal conclusions (namely, that: (1) a class-related analysis should be made in a factual void; and (2) a shareholder might be a member of the class even if the shareholder did not make a qualifying transaction during the class period) were expressly found, by this very Court, erroneous and in contradiction with the applicable rules of civil procedure and ensuing case law.  See Docket Entry No. 104, at 16-30.

2007.  On November 28, 2007, this Court, upon Plaintiffs' motion to expand class definition and Defendants' motion on the pleadings, re-visited the issue of class period and clarified to the parties the scope of this litigation.  See Docket Entries Nos. 104 and 105.

On December 28, 2007, Defendants notified the Court that "Defendants are quite confident that they will succeed in disposing of this case on summary judgment [which would be filed] either immediately or after the deposition" of the sole factual witness who remained undeposed and whose deposition was scheduled for early 2008, Docket Entry No. 106, at 3-4, while the class' counsel notified the Court that they were finally ready to proceed with dissemination of class notice.  See Docket Entry No. 107, at 4-5 ("Now . . . Plaintiffs must send and publish notice to the class.  Plaintiffs intend to submit a proposed order to the Court that . . . will: (i) permit Plaintiffs to retain a notice administrator; (ii) require [D]efendants to cause their transfer agents to provide the notice administrator with the names and addresses of possible [c]lass [m]embers; and (iii) set a schedule for mailing and publication of notice to the class").  On March 7, 2008, in response to the aforesaid information, the Court issued an order directing Defendants' filing of motion for summary judgment and setting up a March 12, 2008, conference with respect to the scheduling of class notice.  See Docket Entries Nos. 108 and 109 (the order and corresponding transcript of the conference, during which the Court was advised that the final factual deposition would take place in late April or early May of 2008 and the class' counsel would proceed with dissemination of class notice).

### D.     EVENTS THAT GAVE RISE TO THE INSTANT MOTIONS

Unfortunately, neither Defendants' motion for summary judgment nor the class' counsel's

dissemination of class notice came to fruition.  Rather, on April 15, 2008, the class' counsel filed

a letter reading, in pertinent part, as follows:

> Plaintiffs' counsel recently were advised that [Amsterdam-Jr.] succumbed to
> cancer and passed away on March 22, 2008. . . . [P]aperwork is [now] being
> submitted to New Jersey probate court to name [Amsterdam-Grandson, the son of
> Amsterdam-Jr. and grandson of Amsterdam-Sr.] successor executor for the estate
> of [Amsterdam-Sr., which is, the sole class representative in this action]. Once
> that is accomplished, [P]laintiffs[' counsel] intend to make an application to this
> Court to substitute [Amsterdam-Grandson] as executor of the estate of
> [Amsterdam-Sr.] for [Amsterdam-Jr.] as executor of the estate of [Amserdam-Sr.]

Docket Entry No. 110.  Learning of this news, Defendants filed a letter stating, inter alia, that,

> [g]iven that class notification has not yet occurred due to [Amstrdam-Jr's] death,
> the parties conferred and all concluded that it would be prudent to postpone the
> filing of any motions for summary judgment until after the substitution process
> has been resolved[,] and the distribution of notice to potential members [has been
> completed.]  We believe that there are at least three reasons why the resolution of
> the class representative and distribution of class notice should precede summary
> judgment: (i) to ensure that the [candidacy of Amsterdam-Grandson] is approved
> by the Court; (ii)  to ensure that there is a class representative to fulfill any
> applicable responsibilities in connection with the summary judgment motions; and
> (iii) to ensure that summary judgment, if granted, will bind all potential class
> members other than those who received notice and opted out.  Accordingly, all
> parties jointly request that the Court endorse our proposal for summary judgment
> motions to be filed within ten business days of Plaintiffs' distribution of notice to
> potential class members following the Court's approval of Plaintiffs' substitution
> request.

Docket Entry No. 112, at 2.

On June 4, 2008, the class' counsel filed a very short motion for substitution of class

representative, which caused Defendants' filing of a very lengthy letter previewing certain key

points of Defendants' forthcoming opposition to the substitution of class representative. See

Docket Entries Nos. 113, 116.

In light of the foregoing chain of submissions, the Court held another conference with the parties on June 11, 2008, see Docket Entry No. 117, during which Plaintiffs' counsel (despite their previous position that testamentary estates, like all other juridical entities, operate through natural persons) attempted to qualify the Court's re-appointment of the lead plaintiff as a purely ministerial task by pointing out that the name of lead plaintiff would remain the same after the re-appointment, i.e., "the estate of Amsterdam-Sr." See id. Defendants' counsel, despite their previously stated desire "to ensure that the [candidacy of Amsterdam-Grandson] is approved by the Court," notified this Court of their intent to vigorously oppose any re-appointment of the Estate of Amsterdam-Sr., if the Estate were to act through Amsterdam-Grandson, on the basis of Amsterdam-Grandson's unsuitability for the position of class representative. See id. In response, the class' counsel informed the Court that: (1) the counsel have been in contact with certain unspecified and unidentified juridical and/or natural person(s) that might, potentially, qualify and be willing to serve as class representative(s); and (2) the counsel may, potentially, intensify their discussions to that effect with these unspecified person(s) in the event Amsterdam-Grandson is deemed an unsuitable lead plaintiff, but (3) these unspecified person(s) do(es) not wish to be considered for the position(s) of class representative until and unless the candidacy of Amsterdam-Grandson is conclusively disqualified from being the lead plaintiff. See id.

Finally, in view of: (1) numerous statements (made in Defendants' post-class-certification motions) suggesting that the class' counsel might be unable to actually produce a sufficiently numerous certified class; and (2) the fact that, two and a half years after class certification and by the end of the sixth year of this litigation, the certified class still remained both unidentified and un-notified, the Court, at the conclusion of the conference, directed the parties to restate their

positions as to the class numerosity by giving the Court at least a general approximation on the basis of the information the parties accumulated at the instant juncture, i.e., upon completion of all factual discovery. See id. Corollary to that directive, the Court asked the parties' counsel whether, in a hypothetical scenario of the class' counsel's inability to verify the numerosity aspect: (1) Amsterdam-Grandson intended to continue prosecuting this action solely on behalf of Amsterdam-Sr.'s Estate, i.e., as a private plaintiff rather than clas representative, and (2) if so, whether Defendants still intended to file a motion for summary judgment in such private action. See id. In response to this hypothetical, the class' counsel opined that the damages of Amsterdam-Sr.'s Estate were estimated to be so substantial that he would almost certainly continue with this action, while Defendants' counsel entered the opinion that Defendants' cost of a motion for summary judgment would likely to be so high that it might be cost-effective for Defendants to simply settle Amsterdam-Sr.'s Estate's claims and close this matter. See id.

On July 3, 2008, Defendants filed their opposition to the class' counsel's motion for substitution of class representative. See Docket Entries Nos. 119 and 120. Defendants' memorandum in support of opposition incorporated Defendants' motion for decertification of the class on the grounds of Plaintiff's failure to demonstrate that the class, if produced, would be sufficiently numerous. See Docket Entry No. 119, at 40-46. On July 23, 2008, the class' counsel filed their reply to Defendants' opposition; as part of their reply, the class' counsel opposed Defendants' motion for decertification.[7] See Docket Entries No. 124 and 125. To that effect, the

_____

[7] Plaintiffs' reply memorandum was filed as a sealed document; the same occurred with all Plaintiffs' declarations and exhibits, including officially filed court documents and even printouts of legal opinions available from online services. The Court examined the docket in this matter and detected Judge Arleo's order of December 17, 2004. See Docket Entry No. 48. While the language of the order (which is, effectively, the parties' stipulation) allows sealing of

class' counsel relied, once again, upon the Miller Declaration, now accompanied by Millers'

Supplemental Declaration ("Supplemental Declaration").  See Docket Entries Nos. 124-4 and

125-1.[8]  In his Supplemental Declaration, Miller clarifies that his position (stated in the Miller

Declaration) has not changed after Miller re-assessed the issue of class numerosity in light of

Defendants' motion for decertification and three pages of this Court's November 28, 2007 sixty-

six page opinion, as well as *unspecified*: (1) "[c]ommonly available databases for stock price and

volume information"; (2) "[l]ist of brokerage industry analyst reports on [FBF]"; (3) "[l]ist of

news reports and press releases on [FBF]"; and (4) "[l]ists of institutional holders of Summit and

[FBF's] stock." Id. at 2-3.  Being presented with a set of two cross-motions reduced to one set of

parties' submissions, this Court finds that it would be useful and ensure against unnecessary

confusion to designate (for the purposes of this discussion only) Defendants' submission

contesting of the Amsterdam-Grandson's candidacy and requesting decertification of the class, as

a moving paper, see Docket Entry No. 119 ("Mem."), and to refer to the class' counsel's

submissions advocating for Amsterdam-Grandson's appointment and opposing Defendants'

request for class decertification as opposing papers.  See Docket Entries Nos. 113-3 ("Opp. I")

and 124-1 ("Opp. II").[9]

---

any "written, recorded, computerized, electronic or graphic matter," the order is limited to
"information of a non-public nature that the . . . [p]arty believes in good faith to be commercially
or personally sensitive or proprietary."  Id. at 1.  The parties should not seal documents that do
not fall into this category.  See Local Rule 5.3.

[8]  Plaintiff docketed the very same Miller Declaration and Supplemental Declaration
twice, under two separate docket numbers.

[9]  The Court notes that the class' counsel's exhibits (made part of Declaration of Julia J.
Sun, Esq.), see Docket Entries Nos. 124-2 and 124-3, are referred to as "Opp.II, Exs."; while
Defendants' exhibits (made part of Declaration of Zoe Segal-Reichlin, Esq.), see Docket Entries

## IV.   MOTION CONTESTING RE-APPOINTMENT OF CLASS REPRESENTATIVE

### A.   CONSIDERATIONS THE PARTIES LEFT UNADDRESSED

Amsterdam-Grandson's candidacy is not proposed as that of an actual plaintiff in his own right; rather, he is a natural person embodying a juridical entity of temporary existence, i.e., the Estate of his grandfather, Amsterdam-Sr., of which Amsterdam-Grandson has recently become an executor.  See Opp. I, Ex. 1; Opp. II, at 7 and n.2.  The class' counsel state in their brief that: "[Amsterdam -Grandson] has shown that he has no adverse interests to the [c]lass, that he is committed to fulfilling his fiduciary duties [to the class,] and that he will vigorously prosecute [this] action on behalf of [both] the [e]state of [Amsterdam-Sr.] and the [c]lass."  Opp.-II, at 17. Moreover, this sole sentence is accompanied by only one document that might be deemed relevant, a "Succeeding Executor Short Certificate" ("Certificate"), issued on June 2, 2008, by the New Jersey Surrogate Court, Essex County, in In the Matter of the Estate of Harry Amsterdam, Deceased.  See Opp. II, Ex. B.  The Certificate states that Amsterdam-Grandson's appointment as the succeeding executor was made pursuant to the terms of Amsterdam-Sr.'s will and for the purposes of execution of that will.  See id.

The reasons for the longevity of Amsterdam-Sr.'s Estate is not apparent from the parties' submissions, which are silent as to this and all estate-related matters.  Here,  Amsterdam-Sr. passed away on November 9, 2002, see Mem., Ex. I (deposition of Amsterdam-Jr.), which means that, by the time of Amsterdam-Grandson's appointment as an executor of Amsterdam-Sr.'s Estate, the Estate had been in existence for more than five and a half years and yet it did not

_____

Nos. 118-2 to 118-25, are referred to as "Mem., Exs."

settle.[10]  And while it is plausible that the Estate's longevity could be related  to the instant

litigation, the sole fact of this litigation does not appear to be the reason for protraction of the

Estate, since: (a) the Estate--rather than particular beneficiaries in whom the right to potential

proceeds from this action vested--remains the entity seeking to recoup its alleged losses

associated with the Estate's sale of Defendants' stock; and (b) the class' counsel did not present

this Court with any probate court order approving Amsterdam-Grandson's (or even his

predecessor, Amsterdam-Jr.'s) pursuit of this class action.  Accord Northern Trust Co. v.

Essaness Theatres Corp., 103 F. Supp. 954, 958 (D. Ill. 1952) ("The [pr]obate [c]ourt concern[s]

itself with the contract by the estate to sell its shares of stock and not with the question of

whether the defendants were guilty of a [securities violation]").  Consequently, the damages the

Estate might recover in this action appear to be destined for distribution in a yet-to-be determined

fashion among the Estate's beneficiaries, whose number, apparently, exceeds one and whose list

might or might not include Amsterdam-Grandson himself.  But, if so, his fiduciary duties as an

executor could conflict with his fiduciary obligations as a class representative.

The legal precedent addressing such type of conflict, while not abundant, is sufficient to

provide this Court with the necessary guidance.  Originally, courts held that the fiduciary nature

of executorship is such that an executor/executrix has the power to act only for the benefit of the

creditors and beneficiaries of the Estate.  See, e.g., First Interstate Bank v. Chapman & Cutler

("First Interstate-District"), 1986 U.S. Dist. LEXIS 23941 (N.D. Ill. June 19, 1986).

---

[10]  An application for substitutionary administration must assert that the original
executor/executrix, after taking upon himself/herself the burden of said administration, departed
this life *leaving certain property and/or assets of the estate unadministered*, wherefore, the
applicant demands judgment that letters of substitutionary administration be granted to him/her.
See, e.g., Daniel I. Libetkin, Basic Estate and Administration 56-57 (N.J. Instit. L. Educ. 2001).

> An administrator is already a representative -- a representative of the estate.  He . . . has no power to act in his own behalf but can act only for the benefit of those to whom he owes a fiduciary duty, the creditors and beneficiaries of the estate.  As class representative[,] he would be taking on duties to persons who are are total strangers to the estate.  Obviously such dual loyalties would lead to conflict.  If nothing else, the administrator would be spending estate assets to pay the costs incident to the representation of the class members.  Such costs could bring no benefit to the estate; by definition the money is spent for others.

Id. , at *7 (citation omitted).  While the Northern District of Illinois' decision in First Interstate-District was affirmed by the Seventh Circuit in First Interstate Bank v. Chapman & Cutler ("First Interstate-Circuit"), 837 F.2d 775, 781 (7th Cir. 1988), the circuit's ruling did not endorse a blanket prohibition.  Rather, the Seventh Circuit concluded only that, in certain situations, there might be an "inherent conflict between an administrator's duty to act for the benefit of beneficiaries and creditors of the estate and the class representative's duty to act for all the class members."  Id. (citing Sec'y of Labor v. Fitzsimmons, 805 F.2d 682, 697-98 (7th Cir. 1986) (en banc), and United Independent Flight Officers v. United Air Lines, Inc., 756 F.2d 1274, 1284 (7th Cir. 1985)).  Juxtaposing that narrowly tailored conclusion against the circumstances of First Interstate, the Seventh Circuit observed that, in order to eliminate the conflict, the executor must, at the very least, show that all of the estate's beneficiaries consented to the executor's acting on behalf of the class, since such showing, if supported by the record, might cure the conflict.  Id..

The rationale of First Interstate-Circuit appears to be adopted by later-issued decisions.  See, e.g., Kaplan v. Pomerantz, 131 F.R.D. 118, 123 (N.D. Ill. 1990).  Drawing distinction between the circumstances presented by First Interstate and an alternative scenario presented for its review, the Kaplan court observed that the plaintiff should certainly not be barred from acting simultaneously as an executor and class representative if: (1) all "beneficiaries of the estate [expressly] consented to the pursuit of the litigation"; and, in addition, (2) "[the executor] avers

that the estate will not bear the costs of the litigation because he will assume those costs

personally." Id. Moreover, the Kaplan court's analysis suggests that the executor might be

permitted to act as a class representative even if the second element is missing, i.e., the executor

does not assume the costs of class litigation, provided that the threshold consent element is met.

> Defendants argue that plaintiff's expenditure of the estate's funds in connection
> with the litigation may be inconsistent with plaintiff's fiduciary obligations to the
> estate[, but this] type of conflict . . . could be alleged with respect to any proposed
> class representative. For instance, if [the decedent] herself were still alive and
> wished to pursue this litigation, [D]efendants [have to] argue that she has a
> conflict of interest because her personal interest in minimizing the expenses of the
> litigation may be inconsistent with her duty to maximize recovery for the class
> members. See State Teachers [Retirement Bd. v. Fluor Corp.], 73 F.R.D. [569,]
> 571 [(S.D.N.Y. 1976)] (rejecting conflict of interest argument for similar reasons);
> Kane Associates v. Clifford, 80 F.R.D. 402, 409 (E.D.N.Y. 1978) (same).

Kaplan, 131 F.R.D. at 123. This Court finds the reasoning of First Interstate-Circuit and Kaplan

courts instructive and, under the rationale articulated by these courts, holds that, at the instant

juncture, Amsterdam-Grandson's candidacy is conflicted because of his wearing of two hats, one

as the executor and another as a class representative.

Here, Defendants indicated their intent to settle this case (but only in the event it

transforms into a private matter by Amsterdam-Sr.'s Estate), and to file a motion for summary

judgment in the near future. As the Estate's fiduciary, Amsterdam-Grandson has to: (a) weigh,

inter alia, the risk of having this action soon dismissed by summary judgment, the risk associated

with a lengthy litigation in the event the summary judgment is denied, the possibility of having

this matter won or lost by the class at the trial, as well as the time/money benefits of securing a

speedy recovery through settlement; and (b) make a fiduciary decision by selecting the option

most advantageous to the Estate. See N.J. Stat. Ann. § 3B:10-23 ("A personal representative is

under a duty to settle and distribute the estate. . . as *expeditiously and efficiently* as is consistent

with the best interests of the estate") (emphasis supplied).

It is indeed plausible that, as the Estate's fiduciary, Amsterdam-Grandson would make a good faith decision to continue prosecuting this action together with the class.  However, it is equally plausible that, reflecting, in good faith, on the goals envisioned by Amsterdam-Sr.'s will, Amsterdam-Grandson would conclude that settling this matter would be in the best interests of the Estate.  See id.; see also Fitzgerald v. Linnus, 336 N.J. Super. 458, 468 (N.J. Super. Ct. App. Div. 2001) ("The will of the testator is the law to the executors, [and] any deviation from such authority is illegal, and at their own risk") (citation and ellipsis omitted).  However, as a class representative--moreover, as the sole named plaintiff in this action--he cannot settle the Estate's claims.  In other words, the Estate is being held hostage by the class action aspect of this litigation, and vice-versa, since Amsterdam-Grandson's fiduciary decision to transform this case into the Estate's private action and to have that private action settled, even if reached by him in good faith, cannot be materialized without violating his fiduciary duty to the class.

The above-outlined conflict presents a hurdle which, perhaps, might be overcome, but should not be overlooked.  See Mickens v. Taylor, 535 U.S. 162, 171 (2002) (clarifying the distinction between an "actual conflict of interest," which necessarily affects one's performance and a "theoretical division of loyalties," the absence of which could be established by evidence).  Being presented here with a record wholly silent as to the beneficiaries' consent to the Estate's participation in this, still-at-the-seminal-stage, six-year-old litigation, the Court finds that Amsterdam-Grandson's candidacy, as the executor of Amsterdam-Sr.'s Estate, is presently conflicted and, thus, subject to disqualification.  See First Interstate-Circuit, 837 F.2d at 781 (clarifying that evidence of consent, which removes the conflict, should be in the record).

Moreover, while it is not implausible that the class' counsel might be able to duly supplement the record,[11] such supplementation would be futile in light of the considerations discussed below.

## B.  CONSIDERATIONS ADDRESSED BY THE PARTIES

Since the cluster of motions currently before this Court developed from the class' counsel's filing of a motion for substitution of class representative, i.e., for appointment of Amsterdam-Grandson as the class representative (or, if such appointment is denied, for leave to name alternative class representatives), the bulk of the Defendants' Memorandum and both the class' counsel's Oppositions is dedicated to arguments about the suitability of Amsterdam-Grandson's candidacy.[12]  Defendants' challenges to his candidacy could be roughly subdivided into three groups: (1) challenges based on the fact of his criminal conviction ("Personal Conviction Challenges"); (2) challenges based on criminal conviction of the business entity, of which Amsterdam-Grandson is now the president ("Business Conviction Challenges"); and (3) challenges based on statements he made during his deposition by Defendants ("Candor and

---

[11]  The Court notes, in passing, its uncertainty as to longevity of the "cure by consent" proffered in First Interstate-Circuit and its progeny, since an express consent by beneficiaries to participation in--and continuation of--a class litigation, even if duly obtained, would beg for renewal of consent, on a regular basis, because--due to the inherent unpredictably of life-- the circumstances of the estate and its beneficiaries might so change with passage of time that the executor/executrix could become unable to fulfill his/her fiduciary obligations by insisting upon continuation of the very course of action selected before the change in circumstances took place.

[12]  In addition to their moving, opposing and replying papers, parties also filed: (a) Defendants' application to submit a sur-reply to--or orally argue against--the Opposition II, see Docket Entry No. 126 ("Application"); and (b) the class' counsel's opposition to the Application. See Docket Entry No. 129.  Defendants' Application asserted that Opposition II contains an unwarranted reading of certain case law and a Federal Rule of Evidence, as well as an undue interpretation of this matter's procedural history and the 06/11/08 Conference.  See Docket Entry No. 126.  On August 6, 2008, the Court denied Defendants' request to file a sur-reply, see Docket Entry No. 130, and now denies Defendants' request for an oral argument, as the submissions together with the prior docket are sufficient.

Interest Challenges").

The Personal Conviction Challenges ensue from the fact that on January 29, 2004, Amsterdam-Grandson plead guilty to a violation of 18 U.S.C. § 201(c)(1)(A) and (2) in criminal matter <u>United States v. Amsterdam</u>, Crim. Action No. 04-0075 (WJM).  <u>See</u> Opp. II, Ex.D, Docket Entry No. 124-2, at 21.  The June 10, 2004, judgment entered by Judge William J. Martini (who presided over Amsterdam-Grandson's criminal proceedings) indicated that the offense he pled guilty to was "Bribery of Public Officials," <u>see</u> <u>id.</u>; the same was stated in the public docket of that criminal action.  <u>See</u> <u>United States v. Amsterdam</u>, Crim. Action No. 04-0075 (designating the criminal charge as "Bribery of Public Officials and Witnesses").

The events that gave rise to Amsterdam-Grandson's criminal conviction related to his employ at Marsellis-Warner ("MW"), a construction and paving company owned by Amsterdam-Grandson's father, Amsterdam-Jr.  <u>See</u> Opp. II, at 12; Mem. at 14 ans Ex. B.  In 1997, MW contracted with the United States Postal Service ("USPS") to perform certain paving and construction work ("MW-USPS Contract").  The work that MW was contracted to perform was supervised by a certain public official and, in 1998, Amsterdam-Grandson, then a project manager at MW, approved a free re-pavement of that public official's driveway.  <u>See</u> Mem., Ex. A at 36; Ex. B.  Eventually, a criminal investigation of MW activities was initiated, and since such free re-paving qualified as a violation of 18 U.S.C. § 201(c)(1)(A) and (2), a separate criminal investigation ensued as to the actions of Amsterdam-Grandson.  Learning of that latter investigation, Amsterdam-Grandson called the public official, whose driveway was re-paved, urging him to misrepresent the fact that the work was done for free, <u>i.e.</u>, to state that a fair reimbursement was paid.  <u>See</u> Mem, Ex. C, at 14-15.  The public official taped the conversation

and refused to commit a misrepresentation.  See id.  Amsterdam-Grandson's criminal prosecution

followed; it took place simultaneously with the criminal prosecution of MW.  Both actions were

presided by Judge William J. Martini of this District, whose Chambers are located in Newark,

New Jersey.

Defendants assert that the very fact of Amsterdam-Grandson's criminal conviction of

bribing a public official provides a basis to his disqualification as a class representative because:

(a) the conviction took place during the pendency of the instant litigation; (b) the act of bribing a

public official constituted a crime of moral turpitude, evidence of which is admissible to attack

Amsterdam-Grandson's credibility, pursuant to Fed. R. Evid. 409, and is particularly egregious in

light of Amsterdam-Grandson's attempt to cover-up his criminal conduct.  See Mem. at 7, 12-16.

The class' counsel disagree.  They allege that: (a) the date of Amsterdam-Grandson's

criminal conviction is irrelevant to the Court's inquiry at hand, rather, the criminal conduct at

issue should be assessed through the fact that it occurred a decade ago, when Amsterdam-

Grandson was twenty-four year old; (b) the crime of which Amsterdam-Grandson was convicted

in 2004 was not, technically, the offence of bribing a public official but a lesser felony of "giving

an illegal gratuity to a public official," and that lesser offense should not be qualified as a crime

of moral turpitude;[13] (c) Judge Martini sentenced Amsterdam-Grandson not to a jail term but to a

---

[13]  The asserted subtle distinction of Amsterdam-Grandson's pleading to the felony of
giving an illegal gratuity to a public official rather than to that of bribery was reflected not in the
docket of United States v. Amsterdam, Crim. Action No. 04-0075, and not in the criminal
judgment and conviction, but in: (a) a memorandum that the Assistant United States Attorney
prosecuting Amsterdam-Grandson's criminal case wrote to the probation office; and (b) a one-
line statement made by Judge Martini during the sentencing.  See Opp. II, at 11.  Defendants,
apparently, were unaware of the distinction when they deposed Amsterdam-Grandson on June 4,
2008, since the class' counsel served Defendants with Amsterdam-Grandson's full criminal
record one month later, that is, on July 2, 2008.  See Mem. at 25, n. 16.  However, it does not

$5,000 fine and two years of probation, from which Amsterdam-Grandson was released after thirteen months due to his compliance with probationary rules and regulations; and (d) Amsterdam-Grandson has "learned from his mistake" and has been since a good standing member of the society.  See Opp. II, at 7-13.

The Business Conviction Challenges ensue from the criminal conviction of MW, the business entity of which Amsterdam-Grandson was the president until 2005.[14]  MW was Amsterdam-Grandson's place of employ since college.  See Opp. II, at 9.  From 1997 to 1999, operating under the MW-USPS Contract, MW: (a) billed the USPS for work that MW did not perform; and (b) upon conclusion of such overbilling, executed a false Contract modification entitling MW to future payments from USPS for the work MW knew it would not perform.  See Mem., Exs. F and G.  The false Contract modification eventually gave rise to criminal prosecution of MW, under 18 U.S.C. § 1018 (the offense known as "Causing an Official to Make a False Writing").  See United States v. Marsellis-Warner, Crim. Action No. 04-0074 (WJM).  On same day he pled guilty in his own criminal matter, United States v. Amsterdam, Crim. Action No. 04-0075, Amsterdam-Grandson also pled guilty, on behalf of MW, in MW's criminal matter, United States v. Marsellis-Warner, Crim. Action No. 04-0074.  See Mem., Ex. G.

On June 10, 2004, Judge Martini sentenced MW to three-years probation and $60,000

---

appear that the class' counsel engaged in undue dilatory tactics, since Defendants themselves concede their knowledge that Amsterdam-Grandson did not inform the class' counsel of the criminal convictions until the day preceding his deposition.  See id.. at 19, n.11; accord Mem., Ex. A, at 58-59 (reflecting Amsterdam-Grandson's statement verifying such concealment).

[14]  According to Amsterdam-Grandson, MW is "basically out of business," and Amsterdam-Grandson cannot be employed by MW if MW is to take a government contract.  See Mem., Ex. A, at 44-45.

fine.  See id.  Since Amsterdam-Grandson was aware of the bills submitted to USPS and the

work performed under the Contract, and he personally executed the illegal modification of the

MW-USPS Contract on behalf of MW, Defendants assert that these facts rendered Amsterdam-

Grandson unqualified to serve as a class representative in this matter.  See Mem. at 18.  The

class' counsel, however, contend that MW's criminal conviction, as well as the role that

Amsterdam-Grandson played in the events underlying that conviction, are wholly irrelevant to

this Court's inquiry at hand since: (a) "[only MW was named as a defendant] that overbilled the

government, not [Amsterdam-Grandson]," and (b) the fact that Amsterdam-Grandson was not

named as an additional defendant in MW's criminal prosecution must be interpreted as indicating

that he was conclusively found innocent of all MW's wrongdoings.  Opp. II at 14-15 and n.22.

 Finally, the Candor and Interest Challenges are based on the statements that Amsterdam-

Grandson made during his June 4, 2008, deposition by Defendants.  Defendants maintain that

Amsterdam-Grandson is not qualified to act as a class representative because he: (a) denied

pleading guilty to bribery charges, citing lack of recollection and assurances he obtained from the

counsel who represented him during his criminal proceedings, see Mem. at 20-22 (relying on

Mem., Ex. A, at 36, 69, 77); (b) attempted to shift blame on persons other than himself with

regard to MW's criminal activity, see id. at 26-27 (relying on Mem., Ex. A, at 19, 27, 30-31, 122,

124, 126, 137); and (c) downplayed his efforts to persuade the public official to provide false

evidence.  See id. at 28-30 (relying on Mem., Ex. A, at 14, 48, 56).  In addition, Defendants

assert that Amsterdam-Grandson's statements verify his lack of interest in the instant litigation,

since he: (a) "had not read a single document pertaining to this six-year old lawsuit other than

[the] Complaint"; (b) had never even opened the files pertaining to this litigation, which he

received upon Amsterdam-Jr.'s death; (c) could identify and had contact information of only one attorney from a single law firm out of the multitude of counsel from four different law firms representing the class in this action; (d) "did not know the identity of any of the three judges who have presided over this case, and had not reviewed a single opinion issued by any of them"; (e) "is completely unaware of the breakdown of responsibility among the four law firms representing Plaintiffs in this lawsuit"; and (f) "has no knowledge about the fee arrangements . . . among the Plaintiffs' [law] firms."  Id. at 31-32 (relying on Mem., Ex. A, at 97, 112-13, 117-18, 120-21).

The class' counsel, on the other hand, assert that the Candor and Interest Challenges are without merit.  According to the class' counsel, Amsterdam-Grandson testified with complete candor during his deposition because he: (a) was in right to deny bribery charges since, technically, he did not plea guilty to the bribery offense but only to that of giving illegal gratuities, a violation "which has wholly different elements and intent" than bribery; (b) did not attempt to downplay the significance of his efforts to persuade the public official to provide false evidence exculpating Amsterdam-Grandson; rather, he merely pointed out that, after the public official conclusively refused to perjure himself, he agreed with the public official that the truth should be told; and (c) was entitled to deny any blame for the illegal activities underlying MW's conviction, since the fact of him not being named as an additional defendant in MW's criminal action verified his innocence as to MW's wrongdoings.  See Opp. II, at 10-11, 13-15 (relying on Mem. Ex. A, at 13-32, 39, 47-50, 54, 58, 80).  The class' counsel also contend that  Amsterdam-Grandson has always been committed to diligently performing his fiduciary duties as the class representative because he: (a) is "neither unknowledgeable nor inexperienced"; and (b) "has evinced an unmistakable desire to prosecute this litigation" by reading the Complaint,

understanding the claims in this litigation, knowing the "identity of the [corporate D]efendant, the composition of the [c]lass, the status of the litigation, and how [the class'] counsel will be compensated," as well as "ke[eping] up-to-date on the progress of [this] litigation by speaking with his father [Amsterdam-Jr., until his father passed away, and] maintaining communications with [the class'] counsel." Id. at 15-17 (relying on Mem. Ex. A, at 97, 104, 106, 109, 113, 115).

## C.   CANDIDACY MEETING CLASS REPRESENTATIVE REQUIREMENTS

Rule 23(a) sets forth four prerequisites to the maintenance of a class action.  Subsection (4) of that Rule provides that the representative party will fairly and adequately protect the interests of the class.  See Fed. R. Civ. P. 23(a)(4).  Since the scheme of Rule 23 "holds potential of binding class members who have no actual knowledge of suit, requirements of due process, as well as necessity for confidence in judicial process, it demands assurance that representative parties can be counted upon to faithfully defend interests of all members of class, [Subsection (a)(4)] was designed to provide that assurance." Du Pont v. Wyly, 61 F.R.D. 615, 621 (D. Del. 1973).  Courts are obligated to carefully scrutinize adequacy of representation in all class actions to ensure the forthrightness and vigor with which the class representative would assert and defend the interests of the class members.  See Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985); Rutledge v. Elec. Hose & Rubber Co., 511 F.2d 668, 673 (9th Cir. 1975); see also, In re Gen. Motors Corp. Engine Interchange Litig., 594 F.2d 1106, (7th Cir. 1979) ("trial court has continuing duty to undertake stringent examination of adequacy of representation by named class representatives and their counsel at all stages of litigation") (emphasis supplied, citations omitted), cert. denied, 444 U.S. 870 (1979); Kaminski v. Shawmut Credit Union, 416 F. Supp. 1119, 1123 (D. Mass. 1976) (prerequisite of Rule 23(a)(4) is met where (a) representative shares,

without conflict, interest of unnamed members of class, and (b) court is assured that representative will vigorously prosecute rights of class).

In determining adequacy of representation, a district court is not confined to specific procedures, and it is proper for the district court to consider all available additional circumstances and facts of a case.  See Schy v. Susquehanna Corp., 419 F.2d 1112, 1116 (7th Cir. 1970); see also In re Goldchip Funding Co., 61 F.R.D. 592, 594 (M.D. Pa. 1974) (personal qualities of class representatives are relevant, indeed necessary, in determining whether the representative parties will fairly and adequately protect interests of class) (relying on Eisen v. Carlisle, 391 F.2d 555 (2d Cir. 1968); Dorfman v. First Boston Corp., 336 F. Supp. 1089 (E.D. Pa. 1973); Wright and Miller, Federal Practice and Procedure, § 1766 at 632-634); Jeffery v. Malcolm, 353 F. Supp. 395, 397 (S.D.N.Y. 1973) (in reviewing adequacy of representation court should weigh, among other factors, actual qualifications of the selected champion for the class). The final decision as to the adequacy of the proposed representative should be reached in light of the *totality* of facts presented for the court's review.[15]  See, e.g., Weisman v. Darneille, 78 F.R.D. 669 (S.D.N.Y. 1978); Amswiss Int'l Corp. v. Heublein, Inc., 69 F.R.D. 663 (N.D. Ga. 1975).

Here, the Court agrees with the outcome of Defendants' argument but not with the

---

[15]  That said, certain Defendants' allegations are irrelevant to the Court's totality-of-factors inquiry.  For instance, while it is asserted that Amsterdam-Grandson does not know the identity of any of the three judges who have presided over this case, the Court is not aware of any Rule 23 interpretation requiring the class representative to know the judge's name.  Similarly, it would be indeed anomalous to require the class representative to know the fee arrangement or allocation of duties *among* numerous attorneys composing the class' counsel, since the representative is neither expected to prepare invoices nor assign legal tasks.  Moreover, while it might, perhaps, be useful to the class representative to have more than a single contact information with the class' counsel, lack of a full registry of all attorneys does not render the class representative either unfit or imprudent: otherwise, lead plaintiffs of all classes represented by a single counsel would automatically be disqualified for not having more lawyers.

particular mode of reasoning employed, since counsel on both sides view the qualification issue

as a chain of *individual* obstacles that Amsterdam-Grandson's candidacy is required to overcome

rather than as a *totality of circumstances* test.   Consequently, a substantial part of the parties'

submissions is dedicated to discussion of Amsterdam-Grandson's criminal conviction and

whether the fact of that conviction could operate as a per se–or, at least, as a critical--disqualifier

of his candidacy.[16]   See Mem. at 12-16 (citing Cortese v. Radian Group, Inc., 2008 U.S. Dist.

---

[16]   Both counsel invested substantial efforts into debating: (1) whether there is a "true" difference between conviction on the grounds of giving an illegal gratuity to a public official and that of bribing one, and (2) whether the former could be evidentially introduced against Amsterdam-Grandson with a clarification that it is a crime of moral turpitude.  Both questions, while perhaps academically interesting, are largely irrelevant to the inquiry at hand.  Thus, the Court merely notes, in passing, its awareness of the fact that there is no Penal Code provision formally designated as "Giving an Illegal Gratuity"; Section 201 has only one title: "Bribery."  See 18 U.S.C. § 201.  The so-called "lesser offense" of "giving an illegal gratuity" is a judicially-created nomination of Section 201's Subsection (c), which, notably, does not even employ the phrase "giving an illegal gratuity."  While Subsection (c) differs from the preceding Subsections, this difference is limited to the fact that the preceding Subsections are "pregnant with the requirement" for a quid pro quo exchange of a specific item of value for a specific official act, while Subsection (c) does not require a specific official act and is satisfied with a mere reward of the public official in exchange for an *unspecified future act that the official will take and may already have taken in the past.*  See United States v. Sun-Diamond Growers, 526 U.S. 398 (1999).  In the same vein, this Court is quite doubtful that a conviction under Subsection (c) cannot be evidentially introduced as a crime of moral turpitude.  See Cerezo v. Mukasey, 512 F.3d 1163, 2008 U.S. App. LEXIS 712 (9th Cir. 2008) ("crimes of moral turpitude are of basically two types, those involving fraud and those involving *acts of baseness or depravity*") (citations and internal quotation marks omitted, emphasis supplied); compare United States v. Dieguimde, 119 F.3d 933, 934 n.3 (11th Cir. 1997) (the fact that a government attorney does not qualify a Section 201(c) conviction as a crime of moral turpitude for the purposes of alien removal is not a legal precedent and, certainly, not a precedent for the purposes of Rules of Evidence inquiry).  However, even if this Court were to find that a Subsection (c) offense is not a crime of moral turpitude, such finding would be: (a) irrelevant, admissibility-wise, see Fed. R. Evid. 609 (allowing a character attack on the basis of witness' conviction of a crime *punishable by imprisonment in excess of one year*); accord 18 U.S.C. § 201(c) (providing for punishment, which includes imprisonment for up to *two* years); and (b) marginally helpful, at best, to the cause of the certified class in the event Amsterdam-Grandson testifies, as a witness during the trial, and Defendants notify the jurors that the witness was convicted for "bribery of a public official," but under such subsection that arguably deals with crimes involving no moral turpitude.

LEXIS 6958, at *13 (E.D. Pa. Jan. 30, 2008); In re Able Labs. Sec. Litig., 425 F. Supp. 2d 562,

573 (D.N.J. 2006); Network Assocs. Sec. Litig., 76 F. Supp. 2d 1017, 1029 (N.D. Cal. 1999);

Maddox & Starbuck, Ltd. v. British Airways, 97 F.R.D. 395, 396 (S.D.N.Y. 1983); Weisman, 78

F.R.D. 669; Folding Cartons, Inc. v. Am. Can Co., 79 F.R.D. 698, 703 (N.D. Ill. 1978); and Ash

v. Brunswick Corp., 405 F. Supp. 234, 248 (D. Del. 1975), in support of Defendants' assertion

that Amsterdam-Grandson's criminal conviction disqualifies him from being a class

representative); see also Opp. II, at 7-9, 12-13 (citing Phipps v. Sheriff of Cook County, 249

F.R.D. 298, 301 (N.D. Ill. 2008); McCall v. Drive Fin. Servs., L.P., 236 F.R.D. 246, 251 (E.D.

Pa. 2006); Walco Invs. v. Thenen, 168 F.R.D. 315 (S.D. Fla. 1996); Hall v. Nat'l Recovery Sys.,

1996 U.S. Dist. LEXIS 11992 (M.D. Fla. Aug. 9, 1996); Haywood v. Barnes, 109 F.R.D. 568,

579 (E.D.N.C. 1986); Serv. Spring, Inc. v. Cambria Spring Co., 1984 U.S. Dist. LEXIS 20671, at

*3-10 (N.D. Ill. Jan. 6, 1984); Weisman, 78 F.R.D. at 670-71; and Ash, 405 F. Supp. at 248, in

support of their contention that the sole fact of Amsterdam-Grandson's criminal conduct is not a

proper basis for his disqualification).

      However, the only conclusion ensuing from the precedent cited by the parties is that case

law is "conclusively inconclusive" as to the propriety of appointing a convicted felon as a class

representative.  This Court, therefore, is not so concerned with the bare fact of Amsterdam-

Grandson's conviction but is extremely concerned with the implications following from the

totality of facts presented for the Court's review, since these facts paint a cumulative picture of a

candidate prone to: (a) exercising poor judgment: (b) ignoring warning signs and electing to

"hide his head in the sand"; (c) excessively relying on unchecked, and often misunderstood,

---

opinions of others; and (d) overlooking significant, occasionally vital, factual and legal details.

Accord Mem., Ex. C (reflecting Judge Martini's observation as to "lack of good judgment").

Stripped from the adversarial ardor of the parties' counsel, the events presented for this Court's review took place *during* the ten years preceding the issuance of the Order accompanying this Opinion, and could be chronologically systemized into the following ten snapshots:

1.      It is September of 1997, and MW, a construction company which frequently contracted with various governmental entities, secures the MW-USPS Contract for performing certain heavy construction work for the USPS.  The nature of the Contract is such that it could be modified if additional work is required to achieve the USPS's goals; such modifications entitle MW to additional monies.  Amsterdam-Grandson, the son of MW's owner, starts his after-college career at MW as one of the project managers.  Allegedly, anticipating to perform work additional to that envisioned under the MW-USPS Contract, Amsterdam-Grandson generates invoices to the USPS; these invoices seek monies for this additional work.  Due to their prospective nature, the invoices should be adjusted prior to payment in the event the anticipated additional work is not performed.  Whilst recognizing that, in the event the invoices are not adjusted, the USPS would be overbilled, Amsterdam-Grandson elects to ignore the danger of overbilling, allegedly, in hope that somebody at the USPS might timely audit and adjust the invoices.  He, however, neither request audits by the USPS, nor audits the invoices himself, nor seeks to have any other person at MW to do the audits, nor changes his practice that keeps resulting in systemic overbilling.  That state of affairs continues for two years.  See Mem., Ex. A, at 14, 16-21; 26; 29-32; 41; 122; 124;

see also Ex. F.[17]

2.      June of 1998.  While the overbilling goes on, Amsterdam-Grandson becomes aware that one of the foremen operating under his supervision develops a close camaraderie with the public official responsible for processing of MW's invoices, many of which keep causing overbilling of the USPS.  Learning from the foreman that the public official desires to have his driveway re-paved, Amsterdam-Grandson, upon the foreman's suggestion, sanctions such re-pavement as a "favor" to the public official.  The illegal aspect of the favor does not enter Amsterdam-Grandson's mind, allegedly, because he reaches his decision to sanction the re-paving because he was "very zealous" and acted without giving the matter any consideration.  See Mem., Ex. A, at 32-35; 41; see also Ex.B.

3.      A year passes by.  It is September of 1999, and the last round of the MW-USPS Contract modification is taking place, entitling MW to monies for yet additional work.  Amsterdam-

---

[17]  The class' counsel appears to be of opinion that the conduct of Amsterdam-Grandson while at MW's employ is irrelevant to this Court's analysis because Amsterdam-Grandson must be deemed "innocent" of MW's criminal offense on the basis that he was not named as a co-defendant in MW's criminal prosecution.  The class' counsel err:  it is proper for the district court to consider, for the purposes of an adequacy of representation review, all available circumstances and facts, see, e.g., Schy, 419 F.2d at 1116, and this Court is not considering Amsterdam-Grandson as a defendant in MW's already closed criminal action.  Moreover: (a) it is axiomatic that a prosecutorial decision to institute a criminal action against one defendant but not another is not a sign of the non-prosecuted person's "innocence" but rather an upshot of the normal exercise of prosecutorial discretion, accord Donahue v. Gavin, 280 F.3d 371, 384 (3d Cir. 2002) ("It is clear from even a cursory reading of the [record] that the [decision not to pursue the charges] can hardly be described as 'indicating the innocence of the accused.' . . . Far from indicating [the non-prosecuted person's] innocence, the [prosecutor's decision] merely reflected an informed and reasoned exercise of prosecutorial discretion as to how best to use [the prosecutor's] limited resources.  It does not suggest that [that person] was innocent of the [criminal activity examined by the prosecutor's office]"); and (b) the fact, as well as details, of Amsterdam-Grandson's participation in illegal activities of MW's were volunteered by Amsterdam-Grandson during his deposition in the instant action.  See generally, Mem., Ex. A.

Grandson, promoted, by that time, to the vice-presidency of MW, is "thrilled" to execute this last modification, even though he knows that no additional work would be performed, and that the USPS would pay MW for that unperformed work.  See Mem., Ex. A, at 123-26; 128; 134-35; 137-38; see also Ex. F.

4.      Three more years pass by.  Amsterdam-Jr., together with Amsterdam-Sr., decides to initiate the instant action.  The Initial Complaint is prepared and filed in September of 2002, listing Amsterdam-Sr., Amsterdam-Jr. and Amsterdam-Grandson as Plaintiffs.  Amsterdam-Grandson, who does not participate in the decision to file the Initial Complaint, signs, nonetheless, a certification accompanying the Initial Complaint.  While he has a telephone conversation with one of the counsel retained by his father and grandfather and is presented with the draft of the Initial Complaint, he does not meet with the counsel, does not discuss the content of the Initial Complaint (even over the phone) and fails to commit to memory the facts that the Initial Complaint is filed while his grandfather is alive, and that his grandfather, Amsterdam-Sr. is named as one of the three Plaintiffs and listed first among the three Amsterdams. See Mem., Ex. A, at 27; 97-99; 104; 153; see also Docket Entry No. 1.

5.      Another year passes by.  It is 2003, and a criminal investigation of MW's overbilling is underway.  During the course of that investigation, the fact of the illegal re-paving is discovered, and a separate criminal investigation is launched against Amsterdam-Grandson personally.  The public official whose driveway was re-paved, in cooperation with the investigating authorities, calls Amsterdam-Grandson and tapes the telephone conversation.  During the conversation, the public official notifies Amsterdam-Grandson that government officials are searching his premises and asks Amsterdam-Grandson how to handle that matter. In response, allegedly out of

"surprise" and being "flustered" by the question, Amsterdam-Grandson, recommends the public

official to misrepresent the fact that the re-pavement was done for free, although he realizes that

he is recommending the commission of perjury and concealing an illegal activity.  Later on, at the

time when government officials arrive at MW's premises to execute a search warrant,

Amsterdam-Grandson calls the public official and leaves him a message recommending to tell

the truth.  See Mem., Ex. A, at 47-51; see also Exs. B and F.

6.      One more year passes by.  It is 2004, and the criminal prosecutions of both Amsterdam-

Grandson and MW are underway.  Being personally charged with a violation of 18 U.S.C. §

201(c), and also representing MW, which is charged with a violation of 18 U.S.C. § 1018,

Amsterdam-Grandson considers entering guilty pleas in his own criminal case and on behalf of

MW.  Assertedly not clear as to the nature of the criminal charges he is facing, Amsterdam-

Grandson relies on the explanation of his counsel that "there are different levels of the offense of

bribery, and if you go into the whatever that federal book is with all the different levels, and you

look at the [offense with which Amsterdam-Grandson is charged], the title and the section, it says

that it's a gratuity" crime, not a bribery.  He, however, elects not to check "the whatever that

federal book is" to verify that "what [he is] pleading guilty to [would not] have the heading of

'Bribery' over it."  Thus, he signs the application for permission to enter plea of guilty to an 18

U.S.C. § 201 offense, having the title "Bribery of Public Officials."   Moreover, he assertedly

fails to understand the nature of the crime he intends to plea guilty to and elects to: (a) continue

believing that the offense of "giving an illegal gratuity" consists of merely giving something of

value to a public official and does not require the element of an unspecified future or past

reciprocal act by the public official; and (b) qualify, in his mind, the element of reciprocity as

ensuring the crime of "bribery." <u>See</u> Mem., Ex. A, at 23; 27; 40; 69; 73; 76-77; 80; 83-86; <u>see</u> <u>also</u> Exs. B, D-F.

7.      It is June of 2004, and Amsterdam-Grandson appears before Judge Martini to plead guilty in his own and MW's criminal cases.  While the events of his conviction are of great significance to Amsterdam-Grandson, he cannot commit to memory either the court where he is being convicted, or even the city and the state where he arrives to take his guilty plea; the only thing he registers and retains is the fact that the court is of federal jurisdiction.  After being convicted, Amsterdam-Grandson is presented with his criminal judgment, but fails to register the fact that the crime of which he is convicted is "Bribery of Public Official" (or registers but consciously elects not to correct this matter) and continues believing that he is "absolutely not" convicted under the Penal Code section so titled.  <u>See</u> Mem., Ex. A, at 21-24; 27; 36-37; 52-53; 68; 73; <u>see</u> <u>also</u> Exs. D and E.

8.      Another year passes by.  It is 2005, and Amsterdam-Grandson, by that time the president of MW, decides to leave the family business.  He concludes that he does not "enjoy the [construction] industry anymore, and [he does not] like the way the legal bills [pile up] from attorneys on lawsuits that [MW has] to file for collections and many other things, [and that he is] just disheartened by the industry."  Prior to his departure from MW and for a short period thereafter, Amsterdam-Grandson, undergoes a number of depositions in connection with the aforesaid legal actions launched by MW.  However, even though he is the president of MW, Amsterdam-Grandson cannot commit to memory either the nature of those legal actions, or the parties sued by MW, or the courts where those actions were filed, or the content of his depositions.  In his mind, these activities "have come to a blur between all of them."  <u>See</u> Mem.,

Ex. A, at 44-45; 88-90.

9.      Another three years pass by.  During these years, Amsterdam-Grandson keeps discussing the progress and events of this litigation with his father, Amsterdam-Jr., who is acting, on behalf of Amsterdam-Sr.'s Estate, as the class representative, but Amsterdam-Grandson does not retain any legal developments that occurred during these three years of discussion, that is, since Judge Bassler certified the class.  On March 22, 2008, Amsterdam-Jr. passes away.  Amsterdam-Grandson: (a) contacts the class' counsel, notifying counsel of his desire to act, on behalf of the still-unsettled Amsterdam-Sr.'s Estate, as the class representative; and (b) begins telephonic communications with counsel, approximately on a once-every-two-months basis.  Becoming aware of the fact that no range of contingent fee for class' counsel services has ever been established, he does not even seek to set that fee; he obviously does not attempt to obtain any written agreement as to the fee arrangement.  He also elects not to put the class' counsel on notice about his and MW's convictions.  Rather, he takes from his father's filing cabinet Amsterdam-Jr.'s files on this matter that Amsterdam-Jr. accumulated and locks those files in Amsterdam-Grandson's drawer without reading or even opening the files.   See id. at 96-97; 104-05; 112-13; 118-19.

10.     June 3, 2008.  Being informed about his upcoming deposition by Defendants, Amsterdam-Grandson meets with the class' counsel, initially a week before the deposition and then the day prior to it.  During the day-prior-to-the-deposition meeting, Amsterdam-Grandson finally discloses to the class' counsel the facts of his and MW criminal convictions.  In preparation for his deposition, he reads solely one document, the Amended Complaint. Somehow, he gathers from the language of the Amended Complaint that "the class is comprised

of anybody that owned Fleet[-]Summit stock at the time of the merger [and had it sold during a certain period]," even though: (a) no owners of the "Fleet-Summit" stock existed either *before or at the time* of the merger, rather, they were created *by* the merger; and (b) *after the merger*, all ex-FleetBoston shareholders, just as all ex-Summit ones, owned the "Fleet-Summit" stock and could sell it, but no statement made in the Amended Complaint suggests that even a single ex-FleetBoston shareholder could be included in the class.  See id. at 58-59; 91-92; 112-14.

The events depicted in these ten snapshots indicate that the candidacy of Amsterdam-Grandson is ridden with the qualities the class cannot afford in its representative.  See, e.g., Hall, 1996 U.S. Dist. LEXIS 11992.  The record before the Court indicates that Amsterdam-Grandson has been treating this litigation in the same fashion that he employed with regard to his business affairs, his criminal prosecution and the various  commercial litigation instigated by the entity  of which he was the president.  The events that took place over the last ten years signal, at the very least: (a) his systemic inability to recognize and remedy even the most apparent and curable wrongs; (b) his lack of desire to study available information and to seek additional information; (c) his willingness to affix his signature on documents the content of which he does not know or does not understand; (d) his frequent failure to think his decisions through, including his proneness to acts allegedly without even considering the criminality of his action; (e) his recurrent inability to appreciate pivotal details and to commit important matters to memory; and (f) his lack of resolve to perform his obligations diligently, vigorously and on his own volition rather than under the threat of audit.[18]  See generally, Mem., Exs. A-F.

_____

[18]  The Court took time to view the three DVDs of Amsterdam-Grandson's deposition provided by the class' counsel and concluded that Amsterdam-Grandson's demeanor during his deposition verifies the impression created by the record.  For instance, he: (a) appeared genuinely

In light of the record so indicating, it would be a clear abuse of discretion for this Court to

trust the class' cause to Amsterdam-Grandson.[19]  See In re Goldchip Funding Co., 61 F.R.D. at

---

bewildered by the fact that he pled guilty to a charge entered under the penal provision titled "bribery," and (b) still insisted on an incorrect list of the elements of that offense, even though, during this particular part of his testimony, he was availed to an off-the-record consultation, seemingly, with the class' counsel.  See Opp. II, Ex. A, DVD 2 of 3, Record Time 15:42 to 15:45.

[19]  On July 21, 2008, Defendants filed a post-Memorandum letter notifying this Court of a recent decision reached by Judge Rakoff of the United States District Court for the Southern District of New York in In re Monster Worldwide Inc., Sec. Litig. ("Monster"), 2008 WL 2721806 (S.D.N.Y., July 14, 2008).  See Docket Entry No. 122.  In Monster, Judge Rakoff was presented with a securities class action, and the class in was sought to be represented by two juridical entities; one of these entities was a certain trade union.  See Monster, 2008 WL 2721806, at *1.  During discovery proceedings, the defendants in Monster deposed two executives of the trade union who were introduced as the persons most knowledgeable about that litigation.  See id. at *4.  However, the statements made by the executives indicated a startling degree of ignorance, causing Judge Rakoff to disqualify the trade union from acting as a class representative.  See id.  Defendant urge this Court to adopt Judge Rakoff's rationale.  See Docket Entry No. 122, at 1; accord Mem. at 15, 18, 21. This Court is cognizant of certain similarities between the case at bar and the facts presented for Judge Rakoff's review.  For instance, as with the executives in Monster, Amsterdam-Grandson does not know the names of individual Defendants in this matter, is unaware of the fact that factual discovery has closed or of Defendant's imminent motion for summary judgment, and--as with the nominees in Monster--he made an effort to obtain the little information he has not out of his vigor to defend and foster the class' interests but out of the need to prepare for his deposition by Defendants.  See Monster, 2008 WL 2721806, at *4 (Judge Rakoff's observation that the trade union had "no interest in, genuine knowledge of, and/or meaningful involvement in this case and is simply a willing pawn of the [class'] counsel"); accord Mem., Ex. A, at 109, 141, 153 (reflecting Amsterdam-Grandson's guessing as to the nature of the sole document he read in preparation for his deposition and stating that he was aware, but"[n]ot specifically, [that] there have been quite a few depositions in quite a few places," even though this case involved a very extensive discovery, which the class' counsel apparently struggled to obtain); Docket Entry No. 107, at 3-4 (a letter from the class' counsel detailing their efforts to obtain international discovery).  However, the disqualifying decision reached by Judge Rakoff differs from that reached by this Court as to *the class' counsel's decision to propose* the rejected candidacy. Judge Rakoff observed:

> The Court will not be a party to this sham. . . . Indeed, the entire set of events . . . leaves the Court with the distinct impression that [the class'] counsel may have not fulfilled their professional responsibilities in proposing [the trade union] as a class representative.

594 (explaining that the courts have looked to factors such as the representatives' honesty,

conscientiousness, and other affirmative personal qualities) (citations and quotation marks

omitted); Richardson v Hamilton Int'l Corp., 62 F.R.D 413, 422 (E.D. Pa. 1974) (stressing that

the ultimate requirement needed to qualify as adequate class representative is the ability of

representative party to assert rights of other class members with utmost vigor and forthrightness);

Buchholtz v Swift & Co., 62 F.R.D. 581, 597 (D.C. Minn. 1973) (reiterating that the primary

criterion is forthrightness and vigor with which representative parties can be expected to assert

and defend interests of members of class) (citation and quotation marks omitted).  Therefore, the

Estate of Amsterdam-Sr., being currently represented by its executor Amsterdam-Grandson, will

be disapproved as a class representative.

The class' counsel requested an opportunity to propose "another [c]lass [r]epresentative"

in the event this Court disapproves Amsterdam-Grandson's candidacy, since such "relief [is]

normally given in situations where a proposed class representative is not approved."  Opp. II, at

17-18 (citing, inter alia, Birmingham Steel Corp. v. TVA, 353 F.3d 1331, 1342 (11th Cir.

2003)).[20]  The Court agrees.  See, e.g., Culver v. City of Milwaukee, 277 F.3d 908, 912 (7th Cir.

2002) (the efficient administration of justice and the interests of the class are not served when the

district court decertified the class without first allowing the class an opportunity to propose other

class representatives, unless the facts at bar indicate that all reasonable attempts to find a suitable

Monster, 2008 WL 2721806, at *4.  Here, the unique circumstances surrounding Amsterdam-
Grandson's nomination clearly indicate that the class counsel's decision to propose his candidacy
cannot be read as putting counsel's professional ethics in question.

[20]   The reason for the class' counsel's reliance on the other decision cited in support to
their request, In re OSB Antitrust Litig., 2007 U.S. Dist. LEXIS 56617 (E.D. Pa. Aug. 3, 2007),
is not clear to the Court since, in OSB, the court appointed eight class representatives.

class representative would be futile, e.g., no class representative except for the disqualified one was proposed within six years after certification).  The Court, however, finds the class' counsel's request to propose "a" class representative unreasonable *at the instant juncture*.  The litigation at hand is entering its seventh year and is brought, according to Miller, on behalf of an unusually large class consisting of almost three hundred institutional shareholders and many thousands of individual ones.  <u>See</u> Docket Entry No. 56-3, at 4-5.  Yet, the class currently has no single class representative.  What the class has is a less-than-encouraging history of: (a) ten proposed class representatives who vanished, one by one, before Judge Bassler even had an opportunity to assess their candidacies; (b) the sole appointed representative who passed away; and (c) the class' counsels' recent nomination efforts that produced a clearly inadequate candidate.  In light of the foregoing, it would be an unwarranted gamble on the Court's part to allow the class' counsel to propose one more class representative who might similarly vanish, or pass away or be simply disqualified.  Indeed, a few repeats of such exercise would either cause a conclusive decertification of the class or send this matter into an eternal procedural limbo.

Consequently, the class' counsel will be granted leave to propose, for the Court's selection and approval, a *group of several* class representatives, either juridical or natural, having no ties connecting them through either employ, common ownership, marriage, first or second degree of consanguinity, or through joint tenancy in Defendants stock.[21]  To illustrate, the juridical entities

---

[21]   The Court notes the strong preference for candidacies of institutional investors, pursuant to congressional guidance provided in the Private Securities Litigation Reform Act of 1995, which amended, <u>inter</u> <u>alia</u>, the Securities Act of 1933 implicated by the case at bar.  <u>See</u> Private Securities Reform Act of 1995, H.R. Conf. Rep. No. 104-369 [1995-1996 Transfer Binder] Fed. Sec. L. Rep.¶ 85,710, at 87,201-87,202 (Dec. 1995); Securities Act of 1933 § 27(a)(3), 15 U.S.C. § 77z-1(a)(3) (2000). The legislative history of the Reform Act refers to evidence that some plaintiffs' counsel in securities class actions make decisions based on their

cannot be a parent and subsidiary corporations, or two affiliates owned by the same parent, since

the decision of one such entity to withdraw from class representation is likely to prompt the other

entity to reconsider its desire to remain lead plaintiff.  By the same token, an employee's desire to

remain a class representative might be substantially eroded by his/her employer's decision to

withdraw from representation and, as the history of this litigation shows, married couples (such

as the Kuliks) and groups having blood relationships (such as the Fosters) tend to withdraw their

candidacies together, which is perhaps understandable on the emotional level but in not helpful

to the class' cause.

Granted the asserted large size of the class, as well as the class' counsel's assurances that

they have been discussing the issue of class representation with a number of prospective

candidates willing to serve as lead plaintiffs in the event Amsterdam-Grandson's candidacy is

disqualified, see 06/11/08 Conference, it should not prove too burdensome for the class' counsel

to find two or three worthwhile nominees.  The class' counsel is, however, requested to *vet all*

own financial interests rather than those of their purported clients.  Congress made an example of
one such law firm, stating that this firm filed 229 different suits over forty-four months and citing
one of its partners as saying, "I have the greatest practice of law in the world: I have no clients."
Report on the Common Sense Legal Reform Act of 1995, H.R. Rep. No. 50, 104th Cong., 1st
Sess. 16 (1995); Report on the Private Securities Litigation Reform Act of 1995, S. Rep. No. 98,
104th Congress, 1st Sess. 6 (1995) ("Senate Report"), reprinted in 1995 U.S.C.C.A.N. 679, 685
(stating congressional preference for institutional investors as class representatives for the
purposes of both '33 Act and '34 Act).  To cure such abuses, Congress chose to "increase the role
of institutional investors in securities class actions," Senate Report at 685, and it declared that
these institutional investors, as lead plaintiffs, should "actively represent the class" and "drive the
litigation." Id. at 689.  The Court will consider these observations when presented with
prominent institutional investors (capable of "driving the litigation") as proposed class
representatives.  The foregoing, however, does not indicate that the Court would necessarily be
averse to appointing natural person(s) as lead plaintiff(s) in this matter.  The Court will consider
such persons if otherwise qualified.

*these candidates thoroughly* to ensure that the proposed class representatives have a bona fide

chance to pass muster under Rule 23, and to avoid unnecessary litigation.

**V.      MOTION REQUESTING CLASS DECERTIFICATION**

Back in October of 2004, the class' counsel filed their amended motion for certification

asserting that the class was "so numerous that joinder of all members [was] impracticable,"

because, as of the date of issuance of the Merger Registration Statement, "there were 26,953

shareholders of record of Summit stock."  See Docket Entry No. 43-2, at 17-18.  In response to

Defendants' opposition, the class' counsel submitted their reply, where they relied upon the

statements made in the Miller Declaration.  See Docket Entries No. 56 and 56-3.  Miller averred:

> At the time of the merger, there were approximately 177 million shares of Summit
> Bank outstanding . . . . [T]here were over 23,000 shareholders of record of
> Summit bank stock at about that time.  This is an extremely large number of
> shareholders of record of that date.  That is, there are many, many stocks which do
> not have anywhere near that number of shareholders of record, due to common
> practice of shares being held in brokerage firm, depository or nominee name. . . .
> [T]here were 282 institutional holders of Summit Bank stock . . . prior to the
> merger[,] which was after the announcement of the merger.  This is meaningful
> because if an institutional shareholder did not want to own the stock after the
> merger, it could have sold before that date.  With the numerosity threshold at 40 . .
> .  suggesting that there were not sufficient [amounts of] shareholders is simply
> ludicrous [because there were] many thousands of . . . shareholders [who suffered
> damaged during the period from when] the stock price began to decline [and until
> it] recover[ed] to the merger level . . . .

Docket Entry No. 56-3, at 4-5.

On December 22, 2005, Judge Bassler certified the class and appointed the Estate of

Amsterdam-Sr., represented by Amsterdam-Jr., as the lead plaintiff.  See Docket Entry No. 76.

Noting that, short of: (a) the adequacy of Amsterdam-Jr.'s candidacy as the class representative;

and (b) numerosity of the class, no other certification elements were contested by Defendants, see

Docket Entry No. 73, at 2, Judge Bassler found the numerosity requirement satisfied, reasoning

as follows:

> Plaintiffs, while they do not provide an exact number, believe [that] the proposed class consists of thousands of Summit shareholders who exchanged millions of Summit shares of common stock.  There were 26,953 shareholders of Summit stock and approximately 175,721,433 shares of Summit common stock outstanding and entitled to vote on the Merger.  Although Plaintiffs have not provided the exact number of the class, the number of the shareholders and outstanding shares support a finding of the existence of at least 40 members of the proposed class sufficient for a finding [of] numerosity. [Defendants] argue[] that Plaintiffs have not demonstrated the numerosity requirement because Plaintiffs' argument wrongly assumes that all Summit shareholders were damaged if[,] at any time[,] they sold [Defendants'] shares below [a certain dollar amount. Defendants, therefore,] urge[] the Court to engage in a more searching analysis similar to that in [Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, a decision by the United States Court of Appeals for the Third Circuit, where] the Circuit Court noted that, at times, it may be necessary for the court to probe behind the pleadings before coming to rest on the certification process. [In the case underlying that Third Circuit's decision,] the district court found that the economic loss was unique to each investor and[,] therefore[,] Plaintiffs' claims did not warrant class certification. [However, in that underlying district case,] the court could draw on a full record from its consideration of a motion for summary judgment, [while Judge Bassler's] evaluation of Plaintiffs' factual and legal allegations is more limited by the nature of the procedural history [of this matter, which--at the time when Judge Bassler was called to rule on the numerosity issue--had not, alas, advanced very far.  Therefore, Judge Bassler concluded that] it was sufficient at [that juncture] to make a more narrow finding that the proposed class satisfi[ed] the numerosity element . . . .

Id. at 3-5 (quotation marks and citations omitted).   Two and a half years passed by, bringing this litigation to the door of its seventh year.  Noting that: (a) although discovery was completed, and the parties accumulated a full record, hence, enabling their command of all underlying material facts; but (b) the class of thousands and thousands shareholders posited in the Miller Declaration still presented itself only through a single class member, that is, the Estate of Amsterdam-Sr., this Court made an inquiry with of counsel, during the 06/11/08 Conference, as to the issue of numerosity, in order to ensure that Defendants are litigating this matter against a real class.  See Docket Entry No. 117.   The parties' responses to this inquiry were made part of their moving

papers dealing with the issue of class representative.

## A.    THE COURT'S POWER OF REVIEW AND APPLICABLE TEST

The key point argued by the class' counsel is that this Court is without authority to revisit the issue of numerosity, since: (a) Judge Bassler, in 2005, issued an "[o]rder [c]ertifying the [c]lass and finding that the . . . class satisfie[d] the numerosity element of Rule 23(a)", Opp. II, at 18 (relying Docket Entry No. 76); and (b) this Court may alter Judge Bassler's determination only in the event of a changed factual situation.[22] Id. (relying on the case law interpreting Rule 23(c)(1)(C)).  The class' counsel assert that since, "[h]ere, the underlying facts have not changed," Judge Bassler's determination should not be disturbed.

The Court disagrees. As the Court already explained to the parties in its previous opinion,

> Pursuant to Rule 23(c)(1)(C), "[a]n order [determining whether to certify a class action] may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C).  . . . [A]s the Notes of Advisory Committee clarify, the goal of Rule 23(c)(1)(C) is to allow the court to make "[a] determination [whether the previous class certification should] be altered or amended [in view of] development of the facts [that might render] the original determination . . . *unsound*."  Notes of Advisory Comm., Subdivision (c)(1) (1966) (emphasis supplied); see Engers v. AT&T, 2005 U.S. Dist. LEXIS 41685, at *2 (D.N.J. Sept. 16, 2005) (citing Zenith Labs., Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 512 (3d Cir. 1976)); see also Richardson v. Byrd, 709 F.2d 1016, 1019 (5th Cir.  1983) (clarifying that a district court is "charged with the duty of monitoring its class decisions in light of the evidentiary developments of the case").  . . . Therefore, a court presented with a Rule 23(c)(1)(C) motion "is 'obliged to take cognizance of a changed factual situation,'" i.e., to make a comparison between the factual circumstances existing at the time of original certification and those existing at the time of the motion. Engers, 2005 U.S. Dist. LEXIS 41685, at *2 (citing Zenith, 530 F.2d at 512); see also Jaynes v. United States, 69 Fed. Cl. 450, 461 (Ct. Cl. 2006).

_____

[22]  Defendants position on the issue in not reflected in their Memorandum, presumably because the class' counsel raised this point in their final submission (referred herein as Opposition II but, in reality, being the class' counsel's reply to Defendants' opposition), and the Court denied Defendants' request for sur-reply, as superfluous.  See Docket Entry No. 130.

Docket Entry No. 104, at 10-11.

The class' counsel appear to misread the phrase "[a] development of the facts [that might render] the original determination . . . unsound."  Perhaps, this misreading is a result of their: (a) misconstruing the Court's citation to Engers, and (b) omitting to notice the Court's reference to Richardson.  See Opp. II, at 18  (citing Engers only).  The conclusion reached in Engers, as with the one reached in Richardson, derived directly from the original language of Rule 23(c)(1)(C) and the Notes of Advisory Committee, which turn on the "*fuller development* of the facts" phrase and do not require discovery of any *qualitatively different* facts.  See Notes of Advisory Comm., Subdivision (c)(1) (1966); Richardson, 709 F.2d at 1019; Engers, 2005 U.S. Dist. LEXIS 41685, at *2.  In other words, the Rule is triggered by "more" facts rather than by "changed" facts: the latter is a sufficient but not a necessary condition.  Therefore, the class' counsel claim that this Court has no authority to revisit the issue of numerosity because "the underlying facts have not changed" is without merit.  Accord Richardson, 709 F.2d at 1019 (the court is "charged with the duty of monitoring its class decisions in light of the evidentiary *developments* of the case") (emphasis supplied).

Here, six years of evidentiary developments established every material fact that the parties need to litigate this matter and brought them at the stage of filing a motion for summary judgment.  Yet, the very same six years of evidentiary developments yielded not an iota of additional information verifying the existence of the class, since the class still has no members to show other than the Estate of Amsterdam-Sr.[23]  Such striking contrast between the accumulation

---

[23]  The record indicates that Amsterdam-Jr. and Amsterdam-Grandson are, without a doubt, not members of the class.  See, e.g., See Mem., Ex. A, at 100-01.  Moreover, the class' counsel never suggested that the remaining "vanished plaintiffs," that is, Nimetsky, Paul, Fink,

of a full factual record and the simultaneous accretion of zero evidence that the class actually exists is, in and by itself, a "factual development" within the meaning of Rule 23(c)(1)(C), triggering the Court's duty of review.  See Richardson, 709 F.2d at 1019.

Indeed, concluding otherwise would create: (a) an anomalous race to the courthouse for plaintiffs aiming to certify their classes at the initial stages of litigation, which are frequently marked by paucity of information; and (b) an even more anomalous incentive for plaintiffs *not* to develop factual evidence as to the existence of their class, since the so-procrastinating plaintiffs would be rewarded for their laxness with an opportunity to have defendants fully litigate--and, perhaps, even settle, that is, for purely market-based rather than legal reasons--flocks of hypothetical class actions that are no-class actions, in actuality.  This cannot be allowed.  As the courts frequently observed, albeit in other circumstances, "[the law] does not save [a litigant] who fails to [develop the necessary factual evidence and then tries to capitalize on the lack of evidence.]  The reason is self-evident: the [litigant] cannot convincingly argue that there [was no change in factual evidence, as time passed by,] if the [litigant] controls the clock." Pelich v. INS, 329 F.3d 1057, 1060 (9th Cir. 2003); see also Singh v. Cicchi, 2008 U.S. Dist. LEXIS 55661, at *18 (D.N.J. July 15, 2008); Phillip v. McKenzie, 2008 U.S. Dist. LEXIS 21037, at *11 (D.N.J. Mar. 18, 2008); Martinez v. Gonzales, 504 F. Supp. 2d 887,898 (C.D. Cal. 2007).  This Court, therefore, finds that it has both the ability and the obligation to revisit the issue of class numerosity, pursuant to the mandate of Rule 23(c)(1)(C).  This, in turn, begs the question of the proper standard that the Court shall employ for the purposes of such successive review.

--------

Mohel, both Fosters and both Kuliks could qualify as members of the class.  Hence, as of now, the Court is presented with the record indicating that the "class" consists of a single plaintiff.

The class' counsel assert that, in the event the Court finds that it has the authority to revisit the issue of numerosity, the Court should not require the class' counsel to establish the exact number of class members.  In addition, the class' counsel suggest that the Court should employ a common sense approach, which, in the class' counsel's interpretation, entails: (a) relying on conclusions stated in the Miller Declaration; and (b) factoring out the issue of whether the class members would ever be able to establish that they suffered an injury as a result of Defendants' alleged wrongdoing.  See Opp. II, at 19-20 and n.29 (citing Freeland v. Iridium World Communs., Ltd., 233 F.R.D. 40, 45 (D.D.C. 2006); In re SeeBeyond Techs. Corp. Secs. Litig., 266 F. Supp. 2d 1150, 1171-72 (C.D. Cal. 2003); Moskowitz v. Lopp, 128 F.R.D. 624, 628 (E.D. Pa. 1989); Shamberg v. Ahlstrom, 111 F.R.D. 689, 698 (D.N.J. 1986); In re Lilco Sec. Litig., 111 F.R.D. 663, 671 (E.D.N.Y. 1986)).  Defendants, on the other hand, maintain that this Court should find the numerosity requirement satisfied only if the class' counsel: (a) presents admissible evidence proving "actual, not presumed conformance with Rule 23(a)," Mem. at 34 and n.26 (quoting Newton, 259 F.3d at 167 (emphasis removed), as well as Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 160-61 (1982), and Unger v. Amedisys Inc., 401 F.3d 316, 319 (5th Cir.  2005)); and (b) establishes that the class members are able to establish the injury. See id. at 35-36 (citing  Shapiro v. UJB Fin. Corp., 964 F.2d 272, 286 (3d Cir. 1992); Krim v. PCOrder.com, 402 F.3d 489, 496-97 (5th Cir. 2005); In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003); Lorber v. Beebe, 407 F. Supp. 279, 296 n.2 (S.D.N.Y. 1975)).  The Court addresses the parties' contentions seriatum.

The class' counsel are indeed correct in their assertion that they need not establish the exact number of class members.  However, as in Shamberg v. Ahlstrom, the case upon which the

class' counsel rely, Defendants do not suggest that the class' counsel are obligated to state "the precise size of the class," rather, Defendants maintain--and the cited precedent requires--that the class' counsel show a "sufficient" number of members.  See Shamberg v. Ahlstrom, 111 F.R.D. at 698; accord Mem. at 34.  Therefore, this issue of exact number of class members is a "non-issue" here, since the parties, this Court and the existing precedent are in complete consensus that, under Rule 23(a), plaintiffs in a class action have the burden of establishing that their class is sufficiently numerous.[24]

Next, Defendants are correct in their assertion that a court's finding of sufficient numerosity could be reached only on the basis of adequate admissible evidence rather than on the basis of unsubstantiated hypotheticals or self-serving bold assertions.  See Falcon, 457 U.S. at 160-61; Unger, 401 F.3d at 319; Newton, 259 F.3d at 167.  That said, the leap of faith a district court is justified in taking when ruling on a class certification issue greatly depends on the stage of litigation during which the issue arises.  While a considerable leap of faith might be warranted at the outset of litigation, when "it is not necessary for the plaintiffs to establish the merits of their case [in a] class certification" motion because "the substantive allegations of the complaint [are the only evidence before the court, and this evidence] must be taken as true," Chiang v. Veneman, 385 F.3d 256, 262 (3d Cir. 2004), a far more searching--if not plainly rigorous--analysis is expected from the court when the certification issue arises (or is revisited) at the stage where the parties have already completed their factual discovery, have command of a full record

---

[24]  Since, here, both sides appear to adopt Judge Bassler's utilization of the threshold amount of 40 class members, see Docket Entry No. 73, at 3 (relying on Stewart v. Abraham, 275 F.3d 220 (3d Cir. 2001), this Court similarly adopts the proposition that, "if the named plaintiff demonstrates that the potential number of  plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart, 275 F.3d at 226-27.

and are ready to proceed with a motion for summary judgment.  See Newton, 259 F.3d at168-69 (noting, within the context of a summary judgment, that, "[i]n reviewing a motion for class certification, [an] inquiry into the merits [might be] necessary to determine whether the alleged claims can be properly resolved as a class action").[25]  This very point was already highlighted to the parties by Judge Bassler, see Docket Entry No. 73, at 4-5, who expressly distinguished the seminal stage of the instant litigation during which he certified the class in 2005, from the circumstances reviewed in Newton (which, the Court notes in passing, are substantively indistinguishable from the instant stage of this case).

This Court, therefore, guided by the observations made by the Court of Appeals in Newton, 259 F.3d at 167, shall now determine whether the content of the Miller's Declaration, that is, the sole piece of evidence presented for the Court's review, read in light of the Court's common-sense assessments of the market practices, establishes an adequate factual basis for conclusion that the class is sufficiently numerous.[26]  See also Falcon, 457 U.S. at 160-61; Unger, 401 F.3d at 319; Moskowitz, 128 F.R.D. at 628.

Miller's statements could be roughly subdivided into two umbrella group of averments.

---

[25]  It appears that the prudential rationale of this distinction ensues from the difference in strategic variables inherent to different stages of litigation.  Indeed, a certification at the earliest stages of litigation affects little, if at all, the following litigation activities, such as discovery, since the presence of Rule 23 commonality, typicality and predominance elements virtually ensure that the discovery proceedings would be substantively identical in a class action and in an action brought by individual litigant or a handful of plaintiffs. Yet, as the litigation progresses, different considerations come into play, and the fact of having a class action setting is likely to begin to increasingly color the parties' strategies.

[26]  Miller's Supplemental Declaration added, substantively, no information useful to this Court, since it: (a) provided nothing but a statement that Miller's position, reached in 2005 and stated in the Miller Declaration, has not changed; and (b) listed generic groups of unspecified sources that Miller allegedly examined. See Docket Entries Nos. 124-4 and 125-1.

First, Miller avers that, at the time of the merger, there was: (a) a substantial number of outstanding Summit shares; (b) a substantial number of Summit shareholders of record holding these shares; and (c) FBF stock was actively traded during the years following the merger.  See Docket Entry No. 56-3, at 4-5.  From these three pieces of information, Miller deduces that it is "simply ludicrous" to presume that less than 40 former Summit shareholders were injured by trading the particular FBF shares they received as a result of the merger (that is, in the event the Merger Registration Statement is deemed legally deficient).  Id.  Second, Miller avers that a finding of sufficient numerosity must necessarily ensue from the facts that: (a) out of 23,000 Summit shareholders of record, 282 were institutional investors; and (b) these investors elected not to sell their Summit stock during the period from when they learned about the upcoming merger to the date of merger but to hold on to these Summit shares and, consequently, obtained FBF stock ("Exchanged Shares") in exchange once the merger took place.  See id.

This Court is not convinced by either of Miller's assertions, since both of them are, at best, indicative of nothing.  Indeed, the former averment (based on the active trading of FBF stock) is unduly overbroad, while the latter one (based on the decision of institutional investors to exchange--rather than to sell--their Summit shares) is based on facts allowing--if not inviting--the conclusion that the numerosity element is *not* satisfied.

The Court begins its discussion with the latter.

### B.    DECERTIFICATION IS UNWARRANTED AT INSTANT JUNCTURE

There is no specific definition of the term "institutional investor": a leading financial dictionary defines "institutional investor" simply as an "organization that trades large volumes of securities."  See John Downes & Jordan Elliot Goodman, Dictionary of Finance and Investment

Terms 282 (5th ed. 1998).   Institutional investors vary widely in size, and while the largest

institutions own or manage vast amounts of money, there are many smaller institutional investors

whose holdings of securities and other investment instruments are relatively modest.  See Nat'l

Ass'n of Sec. Dealers, NASD Rule 2310-3, NASD Manual (CCH) 4265 (2000) (defining an

"institutional customer" as "any entity other than a natural person" and, hence including in the

definition such entities as mutual funds, pension funds, life and casualty insurance companies,

bank-managed personal trusts, corporate profit-sharing plans, state and local governments,

savings institutions, commercial banks, credit unions, and various kinds of nonprofit

organizations, e.g., religious entities, college endowment funds, foundations, etc.).  However, the

principal purpose of these institutions is to invest money on behalf of their shareholders or

beneficiaries.  The growth of some of these institutions into multi-billion-dollar giants, see 17

C.F.R. § 240.15a-6(b)(4) (where the Securities and Exchange Commission defined a "major U.S.

institutional investor" as any entity that owns or controls, or has under management in excess of

$ 100 million in aggregate financial assets), reflects the trend of individuals to invest their

savings in the market indirectly rather than directly, thus enabling even investors with little

capital to invest to gain the twin advantages of professional management of their money and

diversification of their investments.  See Richard A. Brealey & Stewart C. Myers, Principles of

Corporate Finance 181 (1996) ( "Wise investors don't take risks just for fun.  They are playing

with real money. Therefore, they require a . . . risk premium"); Henry N. Butler & Larry E.

Ribstein, Opting Out of Fiduciary Duties: A Response to the Anti-Contractarians, 65 Wash. L.

Rev. 1, 40 (1990) (the Capital Assets Pricing Model, the dominant theory of financial valuation,

states that the market price of securities will reflect "'systematic,' or market-wide, risk . . . which

cannot be eliminated by diversification, but not 'firm-specific' risk, which can be eliminated by

holding diversified portfolios of assets").  And while, for a small/retail investor, diversification

typically means concentrating his/her investments in mutual funds or index funds, for a large or

institutional investor, diversification means spreading its investment dollars over a wide variety

of financial instruments, each with varying levels of risk and time horizons.  See Stanley J.

Feldman, Principles of Private Firm Valuation ("Principles") 80 (2005).

     Here, according to Miller, 282 Summit shareholders were institutional investors (of

unspecified size) who elected to receive Exchanged Shares (that is, FBF stock exchanged for

their Summit shares as a result of the merger) rather than to sell their Summit stock during the

period of time from when the merger became inevitable to when the merger was consummated.

However, the fact that these investors reached the decision to hold on to their shares before the

merger in no event necessitates the conclusion that these investors must have sold their obtained

stock during the period from late December of 2001 to early November of 2003, that is, during

the post-merger years two and three, when FBF shares traded at the price below that of the date

of merger, i.e., the class period.  Indeed, no facts stated in the Miller Declaration suggest that the

institutional investors necessarily elected not to sell their Exchanged Shares during the first year

after the merger, when they could sell them at profit.  Similarly, no fact stated in the Miller

Declaration suggest that the institutional investors necessarily had to sell them during the years

two or three at loss.  A well-funded, well-diversified institutional investor is, typically, willing to

hold in its portfolio securities when price temporarily slides down, provided that these securities

have a fair prospect of rebounding within a foreseeable future.  See Principles at 80.

Consequently, if this Court is to presume that Summit's former institutional investors elected to:

(a) receive the Exchanged Shares rather than to sell their Summit stock prior to the merger, and

(b) keep holding these Exchanged Shares for one year after the merger, a common-sense

conclusion would be that these investors were prepared to hold the Exchanged Shares as a long-

term investment.[27]

Therefore, while the statements made in the Miller Declaration do not necessarily

preclude the possibility that the former institutional shareholders of Summit sold their Exchanged

---

[27] For instance, one can hypothesize that the institutional investors intended to hold their original Summit shares as a long-term investment and considered Summit and FBF stocks virtually interchangeable for the purposes of a diversified portfolio that contemplated, inter alia, an investment into "a" mid-size entity in the banking industry. Indeed, neither Summit nor FBF stock qualified as "blue chips," see <<http://www.djindexes.com/mdsidx/downloads/DJIA_Hist_ Comp.pdf>> (providing Dow Jones Industrial Average listings for the years preceding the merger and the year of merger) or as a "penny-stock." Moreover, the fact that Summit shareholders received 1.02 shares of FBF per each share of Summit, i.e., a nearly 1:1 exchange, as well as the identical industry orientation of both entities (which correlated the financial prospects of both entities with largely the same economic variables), suggests that those institutional investors that purchased Summit shares to fill a certain niche in their respective investment portfolios, were likely prepared to hold similarly positioned FBF stock on the same terms. Alternatively, one can hypothesize that these institutional investors were holding on to their Summit stock in hope to profit after Summit mergers with FBF and kept on holding their Exchanged Shares in hope that FBF-Summit mergered with another bank, pursuant to the mergers-and-acquisitions trend that marked the end of the century, as FBF-Summit indeed did. See, e.g., Andrew Leckey, Bank of America Looks Strong After Merger with FleetBoston, Chicago Tribune 8 (Oct. 3, 2004) (discussing FBF-Summit's merger with Bank of America, a $47 billion deal that closed on April 1, 2004, and noting Wall Street's opinion that FBF-Summit shareholders excessively profited under that merger because "Bank of America paid too much"); Beth W. Orenstein, Small Guy Finds Bank Merger a Plus, E. Penn. Bus. J. 1 (Nov. 3, 2003) (discussing the merger trend in the banking industry). Miller's conclusion that Summit's former institutional investors would have necessarily sold their Exchanged Shares during the class period would seem more reasonable had the Miller Declaration included factual data suggesting that, during the class period: (a) the market believed that FBF shares would not be able to recover for years and years to come, e.g., because of FBF's poor financial performance and accompanying dire lack of lucrative merger prospects; and (b) the former institutional investors of Summit expressly subscribed to such pessimistic forecast. However, the Miller Declaration is wholly void of any data so suggesting, or even of any factually-unsupported assertions to that effect, see generally, Docket Entries Nos. 124-4 and 125-1, and the Court is not aware of any information to that effect.

Shares during the class period (and, thus, qualified as members of the class), the Court's analysis of Miller's statements yields equal--if not more--support for the conclusion that, in the event these investors held on to their Exchanged Shares throughout the post-merger year one, they were likely to keep holding on to these Exchanged Shares until they could sell them at profit, that is, after the class period of post-merger years two and three ended.  If so, this automatically disqualifies these investors from class membership. See Docket Entry No. 105, at 1 (providing the class' definition); accord Mem. at 34, n. 25 (informing the Court that, thus far, no former institutional shareholder of Summit asserted any claim against Defendants).  The Court, consequently, finds Miller's conjecture-like averments inconclusive at best and, at this stage of litigation, refuses to qualify his arguments as adequate evidence--or as any evidence at all--for the purposes of this Court's numerosity analysis.  See  Newton, 259 F.3d at 167.

The Court finds Miller's other line of argument equally insufficient.  In that line of argument, Miller deduces his conclusion that the numerosity element must necessarily be satisfied from two facts: (1) that many Summit shareholders held many Summit shares before the FBF-Summit Merger; and (2) FBF shares were actively traded during the class period, that is, during the post-merger years two and three.  See Docket Entry No. 56-3, at 4-5.

However, Miller unduly conflates the overall pool of *all* FBF common shares (that is, issued by FBF at any time throughout FBF's entire existence) and the small fraction of that pool consisting of the Exchanged Shares.  In other words, Miller fails to recognize that a shareholder can qualify as a member of the class if, and only if, that shareholder obtained some of the

*Exchanged Shares and sold these particular shares* during the class period.[28]  Indeed, the fact

that many Summit shareholders held many Summit shares before the FBF-Summit Merger

prompts nothing more than a conclusion that many former Summit shareholders *might or might*

*have not* sold their Exchanged Shares during the class period.  Similarly, the fact that FBF shares

were actively traded during the class period suggests the very same conclusion, i.e., that, during

the class period, many FBF stock trades *might or might have not* involved the Exchanged Shares.

Pointing out the aforesaid inconclusiveness of Miller's facts, Defendants assert that: (a)

Miller's averment merely indicates the existence of a pool of former Summit shareholders who

sold, during the class period, "any" FBF common shares (which is, by definition, a larger pool of

entities than the class of plaintiffs in this action, as defined by the Court in Docket Entry No.

105); and (b) such former Summit shareholders could qualify as the members of the class only if

they are able to meet the so-called tracing requirement (presumably, the one contained in 15

---

[28]  The Court already clarified this very issue to the parties in its previous order
addressing class certification:

> [The class consists of all] persons or entities who: (1) *exchanged shares of Summit
> . . . stock for shares of FBF . . . stock* in connection with the merger between FBF
> and Summit . . . , *and* (2) *sold such shares of FBF . . . stock* during the class
> period.

Docket Entry No. 105, at 1 (the Court's order, emphasis supplied); accord Docket Entry
No. 104, at 65 (the opinion accompanying the order and containing the very same text).
Miller did not refer to the Court's order; indeed, he examined only three pages of the sixty-six-
page accompanying opinion.  See Supplemental Declaration, Docket Entry 125-1, at 3 (informing
the Court that Miller read only pages 25, 29 and 30 of Docket Entry No. 104).  Since he did not
reference to either the order or page 65 of the opinion, both of which provided the above-quoted
definition of the class, it is not surprising that Miller did not consider of the connector "and,"
which allowed for a shareholder to qualify as a class member only in the event (s)he sold his/her
Exchanged Shares, i.e., only those shares that FBF issued to former Summit shareholders as a
result of the merger.  See Docket Entry No. 105, at 1; Docket Entry No. 104, at 65.

U.S.C. § 77k), i.e., to show that they sold, during the class period, not just "any" FBF common

shares, but the Exchanged Shares, specifically, that is, the very shares that were tainted by

Defendants' alleged misconduct.[29]  See Mem. at 35-36.

Typically, a consumer injured by defective goods has little problem identifying these

goods, be it a vehicle, a garment, a household item, etc.  The same applies to defective legal

titles: an injured party has typically no problem identifying the injurious instrument, be it a real

Estate deed, a patent, a diploma, and so on.  Securities, however, are different in that respect.

The Uniform Commercial Code, Article 8, articulates the existence and transfer of

security interests at the state level.  See U.C.C. 8-101 cmt. (1977).  Since the original draft of

Article 8 assumed that possession and delivery of physical certificates were key factors in a well-

organized securities system, see U.C.C. 8-102(1)(a) and 9-102(16), a certificate-system seller had

to deliver actual certificates, registered in the purchaser's name on the books of the issuer, to the

purchaser or the purchaser's agent.  See U.C.C. 8-107 (1962).  Consequently, to deliver securities

---

[29]  Section 77k provides that, if:

> [if a security was issued, and] any part of the registration statement [pursuant to
> which the security was issued], contained an untrue . . . material fact or omitted to
> state a material fact . . . , any person acquiring *such* [tainted by the untruthfulness
> or omission] security . . . may . . . sue [the issuer of the security or its agents].

15 U.S.C. § 77k(a) (emphasis supplied).  Courts originally applied this tracing requirement only
to section 11 of the Securities Act, see, e.g., Barnes v. Osofsky, 373 F.2d 269 (2d Cir. 1967),
which imposes virtually strict liability on offerors and sellers directly involved in a fraudulent
registered transaction.  See 15 U.S.C. § 77k.  Courts have proceeded to extend the tracing
requirement to section 12(a)(2) of the Securities Act, see, e.g., In re Crazy Eddie Sec. Litig., 792
F. Supp. 197 (E.D.N.Y. 1992), which imposes a negligence standard on offerors and sellers that
prepare oral communications or prospectuses in a fraudulent registered transaction.  See 15
U.S.C. § 77l(2); Gustafson v. Alloyd Co., 513 U.S. 561 (1995) (the ruling which Congress
codified through the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109
Stat. 737).

registered to the buyer, a registered owner, or his/her agent, had to surrender the registered

securities to the issuer or its transfer agent for registration of the transfer to the purchaser. See

U.C.C. 8-102(1)(d) and 8-407(2) (1977); see also U.C.C. 8-102(a)(13) (1994).  The subsequent

burden on issuers who had to print new physical certificates for the transferred securities, and on

the broker-dealers and clearing corporations who had to process the necessary transfer documents

resulting from this physical exchange, led to an industry-wide crisis in the late 1960s.[30]  See

Martin J. Aronstein et al., Article 8 Is Ready, 93 Harv. L. Rev. 889, 890 (1980).    The securities

industry responded by creating a system that employed depositories of securities, which--while

maintaining physical possession of securities certificates--allowed its participants to transfer

securities among themselves through the means of book entries, in a fashion resembling that used

by accountants to move--on the books--a business entity's funds from one account to another.

See Charles W. Mooney, Jr., Property, Credit, and Regulation Meet Information Technology:

Clearance and Settlement in the Securities Markets, 55 Law & Contemp. Probs. 131, 136 (1992).

In 1971, the American Bar Association (through its Committee on Stock Certificates) proposed

its own solution to the market's difficulties, which recommended modifying existing model

corporate codes to fully terminate the use of physical stock certificates, and encouraged the

---

[30]  During the late 1960s, the system for processing securities trades completely collapsed
during the so-called "Paper Crunch," i.e., the conditions which the Securities and Exchange
Commission described as "the most prolonged and severe crisis in the securities industry in forty
years," when brokerage firms had become inundated with paper stock certificates that had to be
altered, recorded, and then physically delivered to issuers for each and every trade. See Study of
Unsafe and Unsound Practices of Brokers and Dealers: Report and Recommendations of the
Securities and Exchange Commission, H.R. Doc. No. 92-231, at 1 (1971).  From June 12 to
December 31, 1968, the New York Stock Exchange suspended all trading on Wednesdays to
allow brokerage firms time to process trades.  See Jeanne L. Schroeder & David Gray Carlson,
Security Interests Under Article 8 of the U.C.C., 12 Cardozo L. Rev. 557, 562 n.13 (1990).

market to create "uncertificated" securities.  See Reporter's Introductory Comments to Revised

(1977) Article 8 of the Uniform Commercial Code, reprinted in 2C U.L.A. 267 (1991). In 1975,

utilizing elements from both propositions, Congress passed amendments to the Securities

Exchange Act, which provided legal legitimacy for the industry's method of "immobilizing"

certificates in securities depositories, and set the stage for complete phasing-out of physical

certificates.  See Securities Act Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97 (1975);

accord 15 U.S.C. §§ 78q-1(e), 78w(b)(4)(C).

By now, where investors hold securities indirectly, e.g., by utilizing securities

depositories, the actual stock certificates are immobilized in the depositories, and the

depositories are designated as "nominal" owner of the securities on the books of the issuer.

Broker-dealers, thus, can transfer or pledge securities through entries on the depository's books,

avoiding the requirement of delivering actual securities certificates.  An investor holding

securities through a broker-dealer, therefore, does not "own" the actual physical securities: rather,

(s)he owns a "securities entitlement" in the aggregate number of shares of a particular stock, or

fungible bulk, controlled by that broker-dealer.  See 17 C.F.R. § 240.13d-3 (1995).  The above-

described type of arrangement is commonly referred to as "street name" registration.[31]  See

Black's Law Dictionary 1421-22 (6th ed. 1990).  While this practice of registering securities in

"nominee" or "street name" made it notably easier for transactions to be cleared in securities

markets, this practice of masking the beneficial owner of each particular security allowed for a

_____

[31]  This book entry system operates like the accounting system of the same name: the
book-entry system involves a combination of physical and nonphysical securities, i.e.,
corporations still issue physical stock certificates, but they now typically are placed in the control
of a depository and registered in the name of a third party "nominee," or a "street name."

peculiar side effect: beneficial owners (that is, the owners of "securities entitlements" in the aggregate bulk of shares of a particular stock) became unable to satisfy the tracing requirement of Section 77k (pursuant to which a shareholder-plaintiff must trace his/her purchases to a specific offering, see 15 U.S.C. § 77k(a)) in the event their aggregate bulks consist of identically denominated and, thus, wholly fungible, shares generated by the issuer as a result of more than one offering.[32]   In other words, when the issuer made only one offering of securities, a simple exercise in logic connects all purchases of the issuer's securities to that sole issuance.  See, e.g., In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 117 (S.D.N.Y. 2004), remanded on other grounds, 471 F.3d 24 (2d Cir. 2006)  However, the tracing requirement of Section 77k draws a distinction between the holders of identically denominated securities generated by the issuer during different offerings, since the holder's ability to establish the genesis of his/her shares is, effectively, a ticket to the court if some of these offerings--but not the others--are tainted by defendants' faulty actions.[33]   See id. at 118 ("the modern practice of electronic delivery and

---

[32]   A derivative phenomenon is reduction of "shareholders of record," since the same depository, being the "street name" for a multitude of beneficial owners, could be registered on the issuer's book as a single shareholder of record. .  "[O]ne entity--Cede & Co.--is listed as the shareholder of record for somewhere in the range of 60 to 80% of the outstanding shares of all publicly traded companies.  Cede & Co. is the nominee name used by the Depository Trust Company . . . , a limited purpose trust company organized under New York law for the purpose of acting as a depository to hold securities for the benefit of its participants, some 600 or so brokerdealers and banks."  Gene N. Lebrun, Fred H. Miller, The Law of Letters of Credit and Investment Securities Under the UCC -- Modernization and Process, 43 S.D. L. Rev. 14, 28 (1998).  Conversely, a substantial number of shareholders of record on the issuer's books suggests--but does not necessarily mandate--that the beneficial owners might hold actual physical certificates which virtually ensures the beneficial owners' ability to perform Section 77k tracing.

[33]   The oddity of the situation of a securities holder's inability to establish the genesis of his/her shares becomes qualitatively indistinguishable from that of a plaintiff who, after buying two different cars and getting injured while driving one of them: (a) requests the court to presume that the car maker is liable for the injury because the plaintiff believes that one of the

clearing of securities trades, in which all deposited shares of the same issue[r] are held together

in fungible bulk, makes it [often] impossible to trace shares to [the faulty] registration

statement").

Defendants assert that the case at bar might present a situation where the number of

litigants able to meet the tracing requirement and wishing to partake in the class action might be

less than the threshold amount of forty.  Defendants point out that the book-entry system of stock

registration might disqualify from membership in the class some or all former Summit

shareholders who sold their Exchanged Shares during the class period, since these shareholders

would be unable to meet the tracing requirement of Section 77k if they: (a) obtained FBF shares

in addition to their Exchanged Shares in FBF ("Alternative Shares") by purchasing such

Alternative Shares after the FBF-Summit Merger or by purchasing and not selling these

Alternative Shares prior to the Merger; and (b) traded FBF shares--after these Alternative Shares

were obtained--in the amount equal to or lesser than that of Alternative Shares.  In other words, if

a shareholder's possession of FBF shares consisted, at any point prior to the end of the class

period, of both the Exchanged Shares and other common shares issued by FBF, and the totality of

this collective possession was recorded as a mere string of book-entries made by a certain

depository/nominee, the Exchanged Shares became fully fungible with other FBF shares for the

purposes of any sale of FBF shares executed by the shareholder after such an intermix of stock,

and a conclusive determination of whether at least one Exchanged Share was sold by the

shareholder during the class period (i.e., of whether the shareholder could establish tracing of at

_____

purchased cars--although surely not the other--was defectively manufactured; yet simultaneously
(b) informs the court that the plaintiff neither knows nor has any way of determining that the car
the plaintiff was driving during the accident was the defective rather than the good vehicle.

least one Exchanged Share with 100% certainty) is possible only through a comparison of the number of the shareholder's Alternative Shares, purchased before the sale, with the amount of FBF shares the shareholder sold.[34]  Mem. at 36-37, 39 n.30 (noting that, in order to enable the mathematical analysis of whether they qualify as class members, the former Summit shareholders must "identify the number of [FBF shares they] held immediately prior to the closing of the Summit[-FBF] merger, . . . acquired thereafter, . . . obtained as a result of the merger, [and] sold during the class period," as well as the dates of those transactions, and citing Krim, 402 F.3d at 496-97, Global Crossing, 313 F. Supp. 2d at 207, and Lorber 407 F. Supp. at 296 n.2).  Asserting that the Miller Declaration is void of any facts suggesting the conclusion that a sufficient number of former Summit shareholders would be able to trace their Exchanged Shares with 100%

---

[34]  The mathematics underlying Defendants' argument appears to be as follows. If a certain former Summit shareholder was, prior to the FBF-Summit Merger, also a shareholder of FBF, that shareholder ended up having, as a result of the merger, two groups of FBF common shares: those (s)he had before the merger, plus the Exchanged Shares.  E.g., if the shareholder had two FBF shares before the merger, and got three Exchanged Shares as a result of the merger, (s)he ended up with the total pool of five shares. (The same pool of five shares ensues if a former Summit shareholder, after obtaining three Exchanged Shares as a result of the merger, purchased two additional FBF shares on the open market without any relation to the merger, or if the shareholder comes to own the pool of these five FBF shares as a combination of buying one pre-merger FBF share, getting three Exchanged Shares, plus buying one more FBF share after the merger).  Yet, such former Summit shareholder has a cause of action only if (s)he traded some (or all) of the Exchanged Shares sold during the class period.  If such shareholder's total pool of five FBF shares was registered in a "street name," the Exchanged Shares in the pool would be physically untraceable.  However, the basic logic suggests that at least one Exchanged Share was traded during the class period if at least three FBF shares were traded during this Period, since no combination of three shares out of five could be made without having one Exchanged Share (i.e., it could be either three Exchanged Shares, or two Exchanged Shares plus one FBF share acquired independently of the merger, or two independently obtained shares plus one Exchanged Share). Hence, pursuant to this mathematical model, the shareholder necessarily meets the tracing requirement with respect to at least one FBF share if, during the class period, (s)he sold the amount of FBF shares equal to the sum of one, plus the number of FBF shares acquired prior to the sale through means other that by getting Exchanged Shares as a result of the merger.

certainty, Defendants maintain that the class' counsel "have not met their burden of demonstrating numerosity" and, consequently, seek decertification of the class. Id. at 37, 39 (alternatively, Defendants suggests that the issue of numerosity could be resolved only after factual data is collected from all former Summit shareholders who "should be sent a notice . . . asking [them to] certify (or provide other acceptable proof) that they held FBF shares they . . . sold FBF shares during the class period[] and can trace any such sales to the merger registration statement by showing that [no] Disqualifying Conditions are present.")

The class' counsel, however, contend that the inquiry as to whether the class consists of the pool of particular entities injured by their Loss-Period sales of the Exchanged Shares or of the overall pool of all entities that sold, during the class period, any common stock ever issued by FBF (regardless of whether or not their sold shares could ever be identified as the Exchanged Shares) goes "directly to the merits of this action and [therefore, such inquiry is] not appropriate at the class certification stage."[35]  See Opp. II at 20 and n.29 (asserting that "numerous courts have expressly rejected Defendants' argument [for the purposes of] the class certification" inquiry

---

[35]  Alternatively, the class' counsel assert, without explaining their bases for such assertion, that tracing is not a problem in the case at hand.  See Opp. II, at 20.  It appears that Miller also made a general statement to that effect.  See Miller Decl., Docket Entry No. 56-3, at 3-4.  Specifically, Miller informs the Court that there was "an extremely large number" of 23,000 former Summit shareholders of record prior to the FBF-Summit Merger.  See id.  Such statement might be interpreted as hinting that the tracing problem ensuing from "street name" registration might be minimal in the case at bar.  To put it in other words, Miller seems to suggest that the class' counsel should have little trouble locating a sufficient pool of non-"street name" shareholders out of these 23,000 choices.  However, Miller's statement is nothing but a pure conjecture, as are his observation that "there are many, many stocks which do not have anywhere near that number of shareholders of record."  See id. at 4.  Both are of no use to this Court, since the fact that shareholders of other corporations could face an even more widespread tracing problem that is in no way indicative of the conclusion that the former Summit shareholders do not have this problem.

and relying on <u>Freeland</u>, 233 F.R.D. at 45; <u>SeeBeyond Techs.</u>, 266 F. Supp. 2d at 1171-72; and

<u>Lilco</u>, 111 F.R.D. at 671).

Oddly enough, the relevant precedents cited by Defendants and class' counsel differ little,

if at all, as to the practical outcome of their holdings.  Since the most notable decision among the

ones cited appears to be the Fifth Circuit's careful review in <u>Krim v. PCOrder.com</u>, 402 F.3d 489,

the Court begins its discussion with that ruling.

In <u>Krim</u>, the investors-aftermarket purchasers challenged certain defendants' registration

statements as false and misleading.  The United States District Court for the Western District of

Texas concluded that all but one investor lacked standing to pursue these claims under 15 U.S.C.

§ 77k, since the investors could not trace their stock to the challenged registration statements.

<u>See</u> <u>Krim v. pcOrder.com, Inc.</u>, 210 F.R.D. 581 (W.D. Tex. 2002).  Conceding that no actual

tracing could be performed, the investors nonetheless asserted they could demonstrate standing

by "constructive tracing," <u>i.e.</u>, by showing a very high statistical probability (exceeding 90%) that

each of them transacted in at least one share generated pursuant to the challenged registration

statements, and it was likely that any "street name"-registered shareholder could make a similar

claim with regard to at least one share (s)he transacted.  <u>See</u> <u>id.</u>  This issue arose and was

addressed at the stage of class certification, which the Western District of Texas denied on the

basis of the investors' inability to meet the tracing requirement through the means of actual, <u>i.e.</u>,

fact-based rather than statistical tracing.  <u>See</u> <u>id.</u>  The Fifth Circuit denied the investors' request

for an interlocutory appeal.  <u>See</u> <u>Krim v. pcOrder.com Inc.</u>, App. Civil No. 03-00001 (5th Cir.

Mar. 18, 2003).  Less than two months later, the Western District of Texas dismissed the suit for

various reasons, reiterating, <u>inter</u> <u>alia</u>, its lack-of-standing rationale.  <u>See</u> <u>Krim v. pcOrder.com,</u>

Inc., 2003 U.S. Dist. LEXIS 7525 (W.D. Tex. May 5, 2003) (dismissing the case for lack of

subject matter jurisdiction and denying intervention).

  The investors appealed the dismissal (but not the denial of certification).  See Krim, 402

F.3d at 494. However, since the issue of lack of standing to sue as a result of inability to perform

actual tracing was indispensably interwoven in the district court's final determination, the Fifth

Circuit's review concentrated on that very issue, hence rendering a decision equally applicable to

a class certification challenge.  See id. at 494-97.  Affirming the district court's conclusion that a

litigant has no Section 77k standing unless (s)he can perform actual tracing, the Fifth Circuit

stressed that

> Section 11 of the Securities Act, imposing civil liability for public offering of
> securities pursuant to a false registration statement, permits any person acquiring
> *such* security to sue.  While Section 11's liability provisions are expansive--
> creating "virtually absolute" liability for corporate issuers for even innocent
> material misstatements--its standing provisions limit putative plaintiffs to the
> "narrow class of persons" consisting of those who purchase securities that are the
> direct subject of the prospectus and registration statement.

Id. at 495 (citations, footnotes and quotation marks omitted, emphasis supplied).  Consequently,

the Fifth Circuit reasoned that a literal and rigid application of the tracing requirement is a

product of Congress' decision to balance the low-burden substantive proof by high-burden

standing requirement, and courts should not abrogate the congressional intent by expanding the

"virtually absolute" liability to claims of purchasers whose securities cannot be traced.  See id. at

495-98 (citing, inter alia Harden v. Raffensperger, Hughes & Co., 933 F. Supp. 763, 766 (S.D.

Ind. 1996) (the decision expressly discussing the balance of burdens)).  Thus, the Fifth Circuit

concluded that, to obtain standing to sue, plaintiffs must be able to trace their purchase of tainted

securities to the faulty registration statement.  See id. at 492 n. 5.  Finally, addressing the

investors' offer to perform "statistical tracing," the Fifth Circuit refused to allow a substitution of

actual facts by a statistical hypothetical, and pointed out that

> accepting such "statistical tracing" would impermissibly expand the statute's
> standing requirement [since every] purchaser [of the issuer's securities generated
> pursuant to any registration statement] would have standing for every share,
> despite the language [of the statute] limiting suit to "any person acquiring such
> security." . . . We decline the invitation to reach further than the statute. The
> fallacy of [the investors'] position is demonstrated with the following analogy.
> Taking a United States resident at random, there is a 99.83% chance that she will
> be from somewhere other than Wyoming.  Does this high statistical likelihood
> alone, assuming for whatever reason there is no other information available, mean
> that she can avail herself of diversity jurisdiction in a suit against a Wyoming
> resident? Surely not.

Id. at 497 (citations, footnotes and quotation marks omitted).  However, in no ambiguous terms,

the Fifth Circuit clarified that a party asserting the right to sue should be allowed an opportunity

to prove so by actual evidence.  See id. at 495-96 (clarifying that direct or "aftermarket

purchasers seeking standing must demonstrate the ability to 'trace' their shares to the faulty

registration but refusing to speculate about how such evidence should be obtained).

A legal wrinkle related to the issue addressed in Krim was examined by the United States

District Court for the Southern District of New York in Global Crossing, 313 F. Supp. 2d at 207.

There, class representatives asserted that their candidacies must be automatically viewed as

satisfying the tracing requirement because the allegations contained in the pleadings filed by the

putative class indicated that the action was brought on behalf of those who purchased the

defendants' common stock traceable to the allegedly faulty registration statement.  See id.

However, just as the Fifth Circuit in Krim, the Southern District of New York found a

substitution of actual facts by a bold assertion impermissible.  The court noted that

> [m]ore [than a bold assertion] is required.  It is well established that a plaintiff
> seeking to represent a class must be a member of the class [(s)]he purports to

represent.  Thus, it is not enough that plaintiffs seek damages only for a class that has standing[: the lead plaintiff, just like any class] plaintiff, must . . . have purchased shares traceable to the challenged offering.

Id.[36]

Finally, SeeBeyond Techs., 266 F. Supp. 2d 1150, the only factually relevant opinion out of the three decision cited by the class' counsel, see Opp. II, at 20 n.29, reached, effectively, the very same conclusion.  In SeeBeyond Techs., ten individual actions filed, pursuant to the Securities Act of 1933 and the Securities Exchange Act of 1934, during the summer of 2002 were consolidated in September of that year, see In re SeeBeyond Tech. Corp., 02-5330 (DDP) (C.D. Cal.), Docket Entry No. 6, and prompted the defendants to file their motion to dismiss six months later, that is, on March 10, 2003.  See id., Docket Entry No. 43.  The court granted the defendants' motion in part and denied it in part, dedicating the bulk of his forty-two-page opinion cited to by the class' counsel to the investors' '34 Act claims.  See id.  However, the court also

---

[36] Two other cases cited by Defendants appear to be of little relevance to the inquiry at hand.  In Shapiro, 964 F.2d at 286, the Court of Appeals for the Third Circuit agreed with the district court that the plaintiffs must allege in their pleadings that their shares are traceable to the faulty registration but noted that the plaintiffs need not prove the same at the outset of their litigation.  See id. (noting that "we cannot say that plaintiffs can prove no set of facts that would entitle them to relief").  However, even if this Court were to factor out that the "no set of facts" test employed in Shapiro, which was conclusively archived by the Supreme Court in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1968-69 (2007) (stating that the "no set of facts" language "has earned retirement" and "is best forgotten"), accord Phillips v. County of Allegheny, 515 F.3d 224, 230-34 (3d Cir. 2008) (same), the holding of Shapiro is factually inapposite to the case at bar, since the issue of allegations made in the Amended Complaint is not before this Court, and it does not appear reasonable to qualify the beginning of the seventh year of this litigation as its "outset" stage.  Similarly, in Lorber v. Beebe, 407 F. Supp. 279 (reported at 407 F. Supp. 295) at footnote 2, the court states that class certification cannot be obtained for the purposes of fostering an already dismissed claim.  (Recognizing the built-in truism of that observation, the United States District Court for the Southern District of New York reduced it to a footnote.)  Since the class' counsel here does not allege that the class should remain certified in order to pursue any claims that were dismissed thus far, the footnote observation in Lorber seems to be as inapposite as the finding made in Shapiro.

allocated two pages of the opinion to the plaintiff's '33 Act claim.  See id. at 38-40.  The court

there stated:

> Under § 11, purchasers of stock have standing to sue [only] if they can trace their
> shares to an allegedly misleading registration statement.  The defendants
> challenge the plaintiff's standing under § 11, arguing that because the plaintiff's
> complaint does not -- and cannot -- specifically allege that plaintiff can trace its
> stock directly to the [challenged] offering, the plaintiff has no standing to bring a
> § 11 claim. The plaintiff responds by arguing that it does in fact make this
> allegation in the complaint [and] cites two paragraphs of its complaint in support
> of this proposition . . . [T]he defendants [however] argue that the plaintiff's
> admission that it did not purchase its stock *directly* in the [challenged] offering
> prevents this allegation from establishing the plaintiff's standing to sue
> [especially] because the plaintiff does not allege that its stock purchase was
> traceable to the  [challenged] offering, but rather alleges that the plaintiff
> represents a class whose purchases are traceable to the offering.  The Court finds
> that the allegation . . . is sufficient [because] the defendants are incorrect in
> arguing that § 11 requires the plaintiff to have purchased its stock *directly*. . . .
> The Court finds that, in this case, whether the plaintiff is able to trace its stock is
> not a question that can be resolved on this motion [to dismiss]. The Court
> acknowledges the defendants' argument that it may be difficult or impossible to
> trace the stock purchased by the plaintiff, but *the plaintiff should be provided the
> opportunity to prove its allegation in this respect*.  Therefore, the Court finds that
> the plaintiff has standing to assert its § 11 claim.

Id. (SeeBeyond Techs., 266 F. Supp. 2d at *1171) (citations, quoted pleaded language and

quotation marks omitted; emphasis supplied).  In other words, the court reached a conclusion

substantively identical to those reached by the Fifth Circuit in Krim and by the Southern District

of New York Global Crossing, i.e., that, the plaintiff's right to sue (rather than the sufficiency of

notice contained in the plaintiff's pleadings) could be established not by the plaintiff's bold

assertion but only by actual evidence, which the plaintiff should be allowed an opportunity to

obtain.[37]

---

[37]  Two other decisions relied upon by the class' counsel, Freeland v. Iridium World
Communs., Ltd., 233 F.R.D. 40 (D.D.C. 2006), and  In re Lilco Sec. Litig., 111 F.R.D. 663
(E.D.N.Y. 1986), frame the tracing requirement in terms of a damages inquiry.  The Court notes

The Court finds the guidance set forth in <u>Krim</u>, <u>Global Crossing</u> and <u>SeeBeyond Techs.</u> helpful and, as did those courts, concludes that a plaintiff has no standing to bring a Section 11 (or Section 12) action unless the plaintiff can satisfy the tracing requirement of Section 77k. Morever, since it appears anomalous to apply this rule to actions brought by individual plaintiffs but not to class action litigants, <u>see Krim</u>, 402 F.3d at 497, the aforesaid conclusion applies to the case at bar.  However, the class' counsel, while apparently conceding to at least the existence of the rule, allege that the standing requirement is irrelevant to the numerosity inquiry posed by

---

its disagreement with <u>Freeland</u> and <u>Lilco</u> courts' conclusion that tracing is a damages issue.  In view of the particular language of Section 77k ("any person acquiring such [tainted by the untruthfulness or omission] security . . . may . . . sue "), this Court reads the tracing requirement in terms of a congressionally-allocated private right of action and concludes that the standing analyses employed in <u>Krim</u>, <u>Global Crossing</u> and <u>See Beyond</u> fostered the congressional intent with a notably better degree of precision.  Moreover, both  <u>Lilco</u> and <u>Freeland</u> appear to be legally and factually inapposite to the case at bar.

In <u>Lilco</u>: (a) the defendants alleged that the predominance requirement of Rule 23 might be unsatisfied if a pool of litigants able of tracing their shares is intermeshed with a pool of litigants unable to do so, and unraveling such an intermeshing would render the (sub)class offered by <u>Lilco</u> plaintiffs unmanageable; but (b) the court, noting that "tracing [would] not pose insurmountable obstacle" to manageability, found that the (sub)class would satisfy Rule 23 because it was "undisputed that the [seventeen] named plaintiffs [representing the (sub)class] all purchased [their] stock pursuant to the [challenged offering]" and reserved the resolution of the tracing issue for a later date.  <u>See Lilco Sec. Litig.</u>, 111 F.R.D. at 671. (Although the <u>Lilco</u> court noted that "determin[ation of] whether a plaintiff owned ["traceable"] or ["untraceable"] common stock . . . is a question of fact reserved for trial," <u>id.</u> at 671, this Court is not entirely clear as to the basis for the conclusion that the tracing question, an inquiry amenable to a "yes-or-no"answer, must necessarily be resolved at trial rather than by a decision on a motion.)  Here, unlike in <u>Lilco</u>, neither the predominance nor the manageability aspects are at issue, rather, this Court--being presented with the class consisting of a single "rank-and-file" plaintiff and no lead plaintiffs whatsoever--faces a problem directly opposite to the unmanageability challenge articulated by the <u>Lilco</u> defendants: it presently has no class to manage.

The Court is equally unpersuaded by the argument made in <u>Freeland v. Iridium World Communs., Ltd.</u>, 233 F.R.D. at 45-46, since--as in <u>Lilco</u>--the <u>Freeland</u> decision suggests that an intermeshing of plaintiffs able to trace their shares with those who cannot satisfy the tracing requirement does not necessarily warrant denial of certification but offers no guidance as to the situation before this Court, <u>i.e.</u>, where a single qualified plaintiff is intermeshed with an abstract group of entities, each hypothetical members of which might be unable to trace his/her shares.

Rule 23.  See Opp. II, at 20 (noting that the "cases cited by Defendants . . . go only to a standing

issue" rather than to that of class certification).

The Court disagrees.  Numerosity is not an abstract concept: the requirement for at least

40 class members articulated by the Court of Appeals in Stewart, 275 F.3d 220, can be met only

by  "real" plaintiffs, each of which has standing to sue.  The benchmark number cannot be

satisfied by a group of 40 or more entities having *no* standing, since the sum of forty zeros is still

a zero.  Moreover, just as the standing of "rank-and-file" class members cannot be "shared-in" by

class representatives, see Global Crossing, 313 F. Supp. 2d at 207, no class member unable to

trace his/her stock can "share-in" or even "temporarily borrow" standing from those plaintiffs in

the class who meet the requirement.[38]  Indeed, finding otherwise would make a mockery of the

---

[38]  As this Court already pointed out to the parties,

"'[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854, 1861 (2006) (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)).  Article III of the Constitution of the United States limits the scope of Federal Courts only to such matters.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Danvers Motor Co. V. Ford Motor Co., 432 F.3d 286, 290-91 (3d Cir. 2005); Lusardi v. Xerox Corp., 975 F.2d 964, 974 (3d Cir. 1992).  If a plaintiff does not present a case or controversy, i.e., fails to show that (s)he has a personal stake in the ongoing litigation, a federal court would not have subject-matter jurisdiction over such a suit.  See United States Parole Comm'n. v. Geraghty, 445 U.S. 388, 396-97 (1980) (holding that a case must be dismissed as moot when the parties lack a legally cognizable interest in the outcome); see also Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007) (same).  "This means that, *throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant*." Spencer v. Kemna, 523 U.S. 1, 7 (1998) (emphasis supplied).  "Abstract injury is not enough.  [To claim justiciability,] the plaintiff must [assert a] direct injury . . . , not conjectural or hypothetical." City of Los Angeles v. Lyons, 461 U.S. 95, 101-102 (1983) (internal citations and quotations omitted).  Therefore, if Plaintiffs' allegations did not include a proper assertion of actual injury traceable to the conduct of Defendants, Plaintiffs' class

Third Circuit's 40-plus requirement, since--if such an interpretation is adopted--a showing of one "real" plaintiffs and thirty-nine "non-plaintiffs" would still meet the benchmark.

Finally, as both <u>Krim</u> and <u>Global Crossing</u> illustrate, a showing that at least forty plaintiffs have standing cannot be made by an abstract, fact-barren statement like the one offered to this Court by Miller, <u>i.e.</u>, by his conclusory "averment" that any "suggesti[on] that there [are] not sufficient [number] of shareholders [in the alleged class] is simply ludicrous," <u>see</u> Miller Decl., Docket Entry No. 56-3, at 4; <u>compare</u> <u>Krim</u>, 402 F.3d at 496-97 (refusing to find standing on the basis of statistical analysis); <u>Global Crossing</u>, 313 F. Supp. 2d at 207 (refusing to accept self-serving bold assertions in lieu of facts), especially if such purported evidence is being offered at the post-factual-discovery stage of litigation.[39]  <u>See</u> <u>Newton</u>, 259 F.3d at168-69.

In light of the foregoing, the Court finds that the class' counsel have failed to establish

---

claim would be insufficient on its face and subject to dismissal for lack of jurisdiction. <u>Accord</u> <u>FleetBoston</u>, 2005 U.S. Dist. LEXIS 36431, at *13 ("the class [has to be] defined so that it identifie[s] the persons . . . entitled to relief") (quoting Moore's Fed. P., <u>Manual for Complex Litig.</u> § 30.14, at 217-18 (3d Matthew Bender 1995))

Docket Entry No. 104, at 16-17 (emphasis in original).

[39]  While the modern practice of electronic delivery and clearing of securities trades causes uncertainty as to a beneficial owner's ability to trace shares to a particular registration statement, it would be anomalous to ignore the congressionally-mandates tracing requirement *at any point of litigation* simply because the beneficial owner elected to take advantage of the conveniences of the electronic age, a decision in which the issuer played no part.  The analysis of the legislative intent might, perhaps, be different in a scenario where an issuer intentionally follows or precedes an issue of tainted securities with an issue of untainted ones: (a) in hope that the tainted securities would end up in "commingled" fungible bulk with the untainted securities; and (b) with an eye on preventing beneficial owners from meeting the tracing requirement.  Here, however, the Court is not presented with such scenario: the class' counsel's submissions made during the past six years do not suggest that  FleetBoston shares circulating in the market before and after the FBF-Summit Merger were anything but <u>bona</u> <u>fide</u> stock issued by FBF without any relation to FBF's issuance of the Exchanged Shares.

that the class is sufficiently numerous and, therefore, have not satisfied the requirements of Rule 23.  However, the Court concludes that decertification of the class would be a draconian measure unwarranted at the instant juncture.  While the six-year history of this action, as previously recounted, is certainly unfortunate, the record before the Court does not indicate that it resulted from any undue dilatory tactics or misconducts.  The Court, therefore, will follow the guidance of SeeBeyond Techs., 266 F. Supp. 2d at *1171, and will: (a) keep the class conditionally certified for a reasonable additional period of time; and (b) allow the class' counsel a reasonable opportunity to provide actual proof of numerosity.  Accord Krim, 402 F.3d at 495-96; Global Crossing, 313 F. Supp. 2d at 207.

That said, the Court disagrees with Defendants that the class' counsel must necessarily survey every former Summit shareholder in order to establish numerosity.  While, indeed, the class' counsel may, if they so wish, conduct such a survey (or poll all former shareholders of Summit by including a relevant inquiry in the class notice), much as the class' counsel may, if they so desire, establish numerosity through the mathematical deducements suggested by Defendants,[40] it is not the province of this Court (or of Defendants) to dictate the class' counsel the means of obtaining the necessary evidence.  The class' counsel is not obligated to conduct any surveys for the purposes of Rule 23; all they have to do is to present factual evidence of thirty-nine or more *actual*--rather than hypothetical--plaintiffs who have standing to sue by being able

---

[40]  Because the mathematical model suggested by Defendants ensures a plaintiff's standing with 100% certainty, the Court: (a) draws a qualitative distinction between the uncertain "statistical tracing" rejected in Krim and the reliable "mathematical tracing" of Defendants' model; and (b) notes that it has no objection to the class' counsel's utilization of the model for the *limited purposes of establishing standing of individual plaintiffs and/or numerosity of the class*. The Court expresses no opinion as to validity of Defendants' model for the purposes of establishing actual damages that might be due to individual litigants and reserves that question.

to trace their Exchanged Shares sold during the class period.[41]

## VI.    RULE 56 MOTION AND THE FUTURE COURSE OF THIS LITIGATION

The decision to keep the class conditionally certified after six years of litigation naturally suggests prompt verification of the existence of the class.   The Court, however, being mindful of the realities of class litigation, recognizes that the class' counsel--while, perhaps, being already well advanced in their efforts to locate class representatives alternative to Amsterdam-Grandson and to establish the class' numerosity--would still require a fairly extensive period of time to detect at least thirty-nine actual plaintiffs having standing and to select and vet several candidates for nomination to represent the class.  The Court finds the period of half a year should be more than sufficient to perform these tasks, that is, granted the instant stage of the litigation, and would consider extending this period only upon the class' counsel showing of  extraordinary circumstances truly unsurmountable by a diligent prosecution of this action.

However, such half-a-year adjournment does not warrant further postponement of the Rule 56 motion contemplated by Defendants.  Defendants assert that such postponement is necessary in order "to ensure that summary judgment, if granted, will bind all potential class members other than those who [elect to] opt[] out."  Docket Entry No. 112, at 2.  However, Defendants' Rule 56 argument is in direct contradiction with Defendants' position on class certification, since--as the preceding part of this Opinion illustrates--Defendants argue, and quite

---

[41]  Since Defendants do not dispute that the Estate of Amsterdam-Sr. has standing, the Court reduces the threshold number down to thirty-nine.  Fortunately, here, the task of finding thirty-nine plaintiffs able to meet the tracing requirements appears to be well within the class' counsel's reach.  See note 38 (discussing statements made in the class' counsel's Opp. II, at 20, which notify the Court that there is no "tracing problem," and Miller Decl., Docket Entry No. 56-3, at 3, which vaguely hints at the same).

persuasively, that the class' counsel might be unable to ever prove existence of the class, that is, within the meaning of Rule 23.  Hence, Defendants' Rule 56 argument invites this Court to postpone Defendants' Rule 56 motion until there is a proof that no class exists in order to bind this non-existing class by the Court's decisions in the postponed action.  The Court fails to see the merit of this argument.

At the instant juncture, it is unclear whether the class' counsel might or might not be able to present the Court with a sufficiently numerous and duly represented class.  Therefore, it appears unreasonable to further halt the litigation brought by Amsterdam-Sr.'s Estate on the basis of such contingencies as the class' counsel proof of the class and/or their production of proper representatives.  Moreover, even if the Court is to hypothesize that the class' counsel would provide the Court with such proof and production in half a year, it appears unlikely the issue of class certification would be immediately settled upon the class' counsel's application, since Defendants have been vehemently challenging all class' counsel attempts to certify the class (or to maintain it certified) throughout the life of this litigation. See Docket Entry No. 51 (original challenge, filed by Defendants on January 21, 2005); Docket Entry No. 58 (repeated challenge, filed by Defendants on April 1, 2004); Docket Entry No. 100-2, at 6-8 (a reiteration of Defendants' skepticism about the propriety of class certification); Docket Entry No. 117 (06/11/08 Conference, during which Defendants reiterated the same), accord Mem. at 33-39 (expressing Defendants' current position that the class should be decertified).  Thus, the Court has every reason to anticipate that the class' counsel's application to finalize the class certification, even if actually filed in half-a-year, would be vigorously litigated well after such half-a-year, all while keeping the litigation of Amsterdam-Sr.'s Estate stalled by this theoretical

class action which might or might not materialize in practice.  That, of course, cannot be allowed.

The Court, therefore, having no certainty when the class aspect of this litigation will be resolved, will--for the time being--sever the litigation of Amsterdam-Sr.'s Estate from the action brought on behalf of the conditionally certified class, and will direct the Clerk to open a separate matter for the latter, while continuing the instant litigation as an individual action of the Estate of Amsterdam-Sr., since Amsterdam-Grandson, while representing the Estate during his deposition, unambiguously indicated the Estate's intent to continue--and ability to finance--its litigation against Defendants.  See Mem., Ex. A, at 142 (reflecting Amsterdam-Grandson's statement that the Estate has the necessary assets and, in addition, certain "proper funding bonds in place" in the amount sufficient to cover all legal expenses in this action, including Defendants' costs and legal fees, if the Estate is found obligated to pay them).  Furthermore, there is no reason to further postpone resolution of the Estate's claims, whether by resolution of Defendants' proposed Rule 56 motion or by trial.[42]

--------

[42]  Defendants' concern that the conditionally certified class might not be bound by the Court's summary judgment decision, rendered prior to the Court's final determination as to certification, appears to be unfounded.  The doctrine of stare decisis binds the class as to the liability issues resolved by the summary judgment(s) in the individual litigation of Amsterdam-Sr.'s Estate, since the parties are in complete agreement that, short of numerosity and representation elements, all other aspects of Rule 23 (such as typicality, commonality and predominance) are satisfied when the liability claims of the Estate are compared with those of the conditionally certified class.  See Wilson v. Vaughn, 533 F.3d 208, 214 (3d Cir. 2008) (citing Pries v. Workers' Comp. Appeal Bd., 903 A.2d 136, 144 (Pa. Commw. Ct. 2006) for the proposition that "[t]he rule of stare decisis declares that for the sake of certainty, a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same, even though the parties may be different," and Schaaf v. Kaufman, 850 A.2d 655, 659 n.5 (Pa. Super. Ct. 2004), for an explanation that a "binding precedent is a decision that 'must be followed when similar circumstances arise'" (quoting, in turn, Black's Law Dictionary (7th ed. 1999)).  In that vein, the Court notes that, in the event: (a) a motion for summary judgment is filed in the individual matter of Amsterdam-Sr's Estate, and that matter is not fully disposed of in favor of Defendants; and (b) the class' counsel succeeds in establishing a class cognizable under

Page 74 of  76

VII.  __CONCLUSION__

For the foregoing reasons, the class' counsel's motion for substitution of class representative will be denied; and the Estate of Amsterdam-Sr., as represented by Amsterdam-Grandson, will be disapproved as the proposed class representative.  Defendants' motion for decertification of the class will also be denied, but the class will remain conditionally certified subject to the class' counsel's: (a) production of evidence verifying the class' numerosity; and (b) nomination of class representatives meeting the requirements of Rule 23.

The instant matter will be re-qualified into Amsterdam-Sr.'s Estate's individual action of against Defendants.  The Clerk of the Court will be directed to open a new and separate matter for the conditionally certified class.  Counsel on both sides will be required to file with the Clerk a list of all attorneys appearing in each of these two actions, including attorneys admitted on record pro hac vice; such lists shall detail each attorney's law firm and complete contact information.  In the event the Estate of Amsterdam-Sr. retains counsel other than the class' counsel, the counsel for the Estate shall file with the Court the counsel's appearances.

In the individual matter of Amsterdam-Sr.'s Estate, the Estate will be directed to file an affidavit verifying the Estate's actual existence, i.e., verifying the fact that, as of now, the will of Amsterdam-Sr. has not been fully administered.  In the event the Estate has been settled and/or

---

Rule 23, the Court intends to consolidate the Estate's individual matter with the class action for the purposes of all pre-trial and trial proceedings, determination of damages, etc.  Moreover, in the event: (a) the individual matter of Amsterdam-Sr's Estate is not disposed of in favor of Defendants by a Rule 56 determination; but (b) the class' counsel locates plaintiffs having standing to sue in the amount insufficient to meet the numerosity requirement, this Court would not be averse to considering, *for good cause shown*, the class' counsel's application for substitution of the conditionally certified class by a joinder of such plaintiffs and simultaneous consolidation of such plaintiffs' action with the individual matter of Amsterdam-Sr.'s Estate.

the interests in the losses (allegedly incurred by the Estate as a result its sale of Amsterdam-Sr.'s Exchanged Shares during the class period) have already vested in specific beneficiaries and/or trustees, the counsel for the Estate shall file an application for substitution of plaintiff.  In addition, in the event the individual matter of Amsterdam-Sr.'s Estate is not settled, Defendants shall proceed with their application for summary judgment, that is, provided that such application is still contemplated.

In the matter of the conditionally certified class, the class' counsel will be granted leave to propose a group of class representatives; such group shall consist of no less than two entities having no ties connecting them through employ, common ownership, marriage, first or second degree of consanguinity, or joint tenancy in Defendants stock.  In addition, the class' counsel shall provide the Court with evidence verifying the class' numerosity; such evidence must show existence of at least thirty-nine non-hypothetical plaintiffs, and each plaintiff must be shown to have standing to sue Defendants by virtue of this plaintiff's ability to trace his/her Exchanged Shares sold during the class period.

An appropriate Order accompanies this Opinion.


                                        s/ Garrett E. Brown, Jr.
                                        _____
                                        **GARRETT E. BROWN, JR.**
                                        **Chief Judge**
                                        **United States District Court**

Dated: October 20, 2008